STATE ex rel. RAILROAD & WAREHOUSE COMMISSION v. MINNE-APOLIS & ST. LOUIS RAILROAD COMPANY and Another.[1]

June 13, 1900.

Nos. 12,111—(207).

### Tariff of Railroad Commission—Mandamus to Enforce.

On the hearing in the district court upon an application for a writ of mandamus to compel a common carrier to obey and comply with an order fixing a tariff of rates made by the state railroad and warehouse commission, the carrier is entitled to an examination of matters of fact, in which evidence de novo may be taken. Under the provisions of G. S. 1894, § 393, such an order is not conclusive as to the reasonableness of the tariff, in the absence of an appeal therefrom.

### Laws 1895, c. 91, Constitutional—Joint Through Rate.

Held, following Jacobson v. Wisconsin, M. & Pac. R. Co., 71 Minn. 519, that such part of Laws 1895, c. 91, as authorizes said commission to establish by order joint through rates for the transportation of freight over any two or more connecting lines of railway within this state, and to compel obedience thereto, does not violate any of the constitutional provisions, federal or state.

### Reasonableness of Rate—Cost of Operating Railway.

Held, that when estimating the cost of operating a railway per ton of freight per mile of carriage, for the purpose of determining the reasonableness of a tariff of rates fixed by the commission, it is error to take into consideration an amount of the earnings which has been appropriated and paid out as dividends on stock shares of such railway.

### Same—"Commercial Necessity."

When considering the reasonableness of such rates, the commission and

[1] Reported in 83 N. W. 60.

the courts are justified in taking into consideration what is known as a "commercial necessity," namely the application of principles when fixing rates which are forced upon common carriers by various conditions and circumstances, and are in common practice among them,—a business policy which actuates and influences the carriers themselves to disregard a rule of strict comparison and strict equality as between bulk, or weight, or value, as well as distance of carriage.

### Tariff of Commission Prima Facie Evidence—Evidence not Rebutted.

G. S. 1894, §§ 381, subd. c, 392, subd. a, and Laws 1895, c. 91, § 3, subd. c, provide that the tariff of rates made by the commission shall be taken by the courts as prima facie evidence that such tariff is equal and reasonable, the burden being on the carrier to show to the contrary. *Held*, on the proofs in this action, whether the rule laid down in Steenerson v. Great Northern Ry. Co., 69 Minn. 353, as a basis for ascertaining what are reasonable rates, be applied, or the rule, of greater value to defendant carrier, announced in Smyth v. Ames, 169 U. S. 466, that defendant did not rebut and overcome the prima facie character of the tariff in question, which was upon coal in car-load lots.

### Present Cost of Railway—Amount of Stock and Bonds.

Courts cannot assume that the cost of reproduction of a line of railway, or that the present, as compared with the original, cost of construction, is the amount of stock and bonds outstanding, or that it is what the road has cost up to the time of the trial.

Alternative writ of mandamus issued from the district court for Ramsey county to compel defendants Minneapolis & St. Louis Railroad Company and St. Paul & Duluth Railroad Company to adopt a joint rate fixed by order of relator and dividing the moneys to be earned thereby as directed by the order. The case was tried before Bunn, J., who found in favor of relator. From a judgment entered pursuant to the findings and commanding the issuance of a peremptory writ, defendant Minneapolis & St. Louis Railroad Company appealed. Affirmed.

*Albert E. Clarke*, for appellant.

*W. B. Douglas*, Attorney General, and *C. D. & Thos. D. O'Brien*, for respondent.

COLLINS, J.

The St. Paul & Duluth Railroad Company operates a line of railroad from Duluth, Minnesota, to the cities of St. Paul and Minne-

apolis, Minnesota.  The Minneapolis & St. Louis Railroad Company operates a line of railroad from the cities of St. Paul and Minneapolis to the various points in the state of Minnesota designated in the order of the railroad and warehouse commission which is under consideration in this case.  Both of the defendants are fully equipped to conduct the business of common carriers of freight, have complete track connection and transfer facilities at the cities of St. Paul and Minneapolis, and for a long time have been engaged in transporting hard coal in car-load lots without change of cars from Duluth to the points upon the line of the Minneapolis & St. Louis road for a joint through rate, which had been established by the mutual agreement of the defendants, and which had been divided between the defendants according to that agreement.

.  On September 22, 1898, the railroad and warehouse commission of this state, under a resolution, entered upon the investigation of the reasonableness of said joint rate for hard coal in car-load lots so established by the defendant.  The defendants duly appeared and took part in the investigation, and on January 19, 1899, the railroad and warehouse commission made an order establishing a joint through rate for the commodity in question, known herein as "Schedule B."  After the due publication and service of the order, the defendants failed to agree upon a division of the rate ordered by the commission, and the Minneapolis & St. Louis Railroad Company withdrew all tariffs on hard coal in car-load lots which had been established under the agreement with the Duluth road.  The railroad and warehouse commission, having cited the defendants to appear, made the order of April 8, 1899, directing how the joint through rate should be divided between the defendants.  The orders of the commission were duly promulgated and published as provided by law.  No appeal was taken therefrom.

`  Neither of the defendants filed or posted schedules of the new tariff, and the defendant the Minneapolis & St. Louis Railroad Company refused to receive or transport coal under the orders of the commission, and this proceeding was commenced in the district court of Ramsey county to compel the defendants to comply with such orders.  After a trial, judgment was entered confirming the

80 M.—13

orders of the railroad and warehouse commission, and commanding the issuance of a peremptory writ, as demanded in the petition filed in this proceeding. This appeal is from a judgment entered in accordance, and also from an order previously made denying a motion for a new trial made by defendant railway company.

1. We are of opinion that the contention of counsel for the relator board, that the order complained of is conclusive in the absence of appeal therefrom, is without merit. G. S. 1894, § 393, subd. d, provides for an appeal from the commission to the district court, and that

"Upon such appeal, and upon the hearing of any application by the commission or by the attorney general, for the enforcement of any such order made by the commission, the district court shall have jurisdiction to, and it shall, examine the whole matter in controvery, *including matters of fact* as well as questions of law, and to affirm, modify or reverse such order in whole or in part, as justice may require"; and that "the remedies herein provided for shall be in addition to all existing legal and equitable remedies."

Evidently, more than one remedy is contemplated. No effect would be given to the language we have italicised if it was not intended that in a proceeding like this, to enforce an order made by the commission, there should be just such a trial as there would be if an appeal had been taken from the order. On such appeal, the court will examine matters of fact to ascertain whether there is any evidence reasonably tending to support the disputed findings of fact, taking evidence de novo. Steenerson v. Great Northern Ry. Co., 69 Minn. 353, 72 N. W. 713. It may not have been necessary, in view of the amendment (Laws 1891, c. 106), requiring that notice of a hearing should be given by the commission, that any hearing in the courts should be had on the merits, except on appeal; but that is not the question. It is simply one of statutory construction. It was not incumbent upon the defendant to appeal from the order, that it might have an investigation on the facts.

2. As stated by counsel for the railway company, the substantial questions involved are two. One is the validity of the law pursuant to which the order of the commission was made and the judgment appealed from entered, and the other is the validity and cor-

rectness of the action of the court below whereby it affirmed and sustained the said order.    The latter question is a very serious one, under any circumstances, and will continue so to be until we have more definite utterances on the subject from the supreme court of the United States, the tribunal in which the constitutional questions involved must finally be determined.

3. As to the first of those questions, a joint rate for car-load lots of coal, both hard and soft, had been agreed upon between the railway lines affected by the order, and had been put in effect some time prior to any action on the part of the commission, and earnings thereunder were divided between the carriers participating in the transportation.    The tariff rate for coal per ton from Duluth to the first station south of Minneapolis (Hopkins), about nine miles, and on defendant's line of road, was $1.75.    To Norwood, a trifle over forty miles from Minneapolis, it was $2.50.    It was the same to the stations southerly, twenty-one in number; the one most southerly being Boyd, 152 miles distant from Minneapolis, or about 112 miles beyond Norwood.    That is, the rate agreed upon was the same per ton in car-load lots, whether it was transported to a station forty miles south of Minneapolis, or to another station 152 miles distant.    And of this agreed rate it was stipulated by the railway companies that the carrier from Duluth to Minneapolis should receive one dollar per ton, distance 162 miles.    We refer to these figures for the purpose of calling attention to what is evidently a fact, that the defendant was either carrying coal to Boyd at a loss, or was collecting too much tariff per ton on the same article transported to Norwood.    We presume that these regulations as to rates were compelled by what one of defendant's witnesses called "commercial conditions" which made them necessary,—not unlike those conditions referred to by the writer in a concurring opinion in Steenerson v. Great Northern Ry. Co., supra, which permit or compel a discrimination between places and commodities, where railway officials make schedules of rates for the transportation of passengers and merchandise, which are countenanced by the interstate commerce commission as therein noted.

It has been held by the highest authority in the land, under a provision found in the interstate commerce act, that when connecting

carriers voluntarily enter into joint traffic arrangements the joint rate must be reasonable, and may be made so.   Cincinnati, N. O. & T. Pac. Ry. Co. v. Interstate Com. Com., 162 U. S. 184, 16 Sup. Ct. 700.   But, independently of a previously existing joint arrangement, we see no reason why, under the amendatory act (Laws 1895, c. 91), the commission cannot lawfully compel a joint arrangement in a case like this.   The evidence shows that the location of the Duluth road and the Minneapolis & St. Louis road, their track facilities, equipment, etc., are such that, by operating together under joint traffic agreements, the cost of the service can be greatly lessened.   The public has, at least, a right to share in the benefits of this condition.   If it is judicious so to do and of public benefit to have joint traffic arrangements in any given case, why should not the public be permitted to compel such arrangements to be made?

"If the state is to have any voice, therefore, in the establishment of reasonable rates, it must have a voice in some degree and some manner in the business of the carrier.   Where a single carrier is being dealt with, this can be accomplished by determining what the operating expenses ought reasonably to be; the reasonable value of the capital invested; what return, under all the circumstances of the case, would be fair; and then, by adjusting the rate, an economical management is secured.   But in a case like the one at bar, where each may plead its inability to make the necessary agreement with the other, the state must have the power to arbitrate between them, and, within proper limitations, compel the acceptance of its award." [2]

If the state is powerless to decide as between carriers, we have, as said by counsel for the commission, the following absurdity, namely: "(a) The state may regulate rates; (b) the rate must be reasonable; (c) it must afford the carrier compensation over and above operating expenses; (d) the method of operating and consequent expenses is beyond the state control."

But this question has heretofore been considered and disposed of in this state adversely to defendant's contention in Jacobson v. Wisconsin, M. & Pac. R. Co., 71 Minn. 519, 74 N. W. 893, now in the United States supreme court on a writ of error.[3]   It was there held that the act of 1895 did not, under the facts of that case, contravene

[2] Respondent's brief, page 9.          [3] See 179 U. S. 287 [Reporter.]

the federal or the state constitution when conferring upon the commission the power to compel the transfer and interchange of loaded cars, and the making of joint rates for through shipments, where the haul was in part on one, and in part on the other, of two connecting roads.   There are no facts here which take this case out of the operation of the rule thus established, and we must abide by it as perfectly legitimate, until the federal court declares that an error has been committed.   We hold, therefore, that Laws 1895, c. 91, violates no provision of the state or federal constitution, and under it the railroad and warehouse commission of this state has the power to compel the enforcement of joint through rates between points within this state by the connecting carriers affected by the order.

4. As to the second and most perplexing of these questions: By G. S. 1894, §§ 381, subd. c, 392, subd. a, and Laws 1895, c. 91, § 3, subd. c, it is enacted and provided that the tariff of rates, fares, charges, or classifications made by the commission shall be deemed and taken in all courts of this state as prima facie evidence that such tariff is equal and reasonable; the burden being on the railway company to show that the rates as fixed are unequal or unreasonable.   This burden was on the defendant carrier when it resisted the enforcement of the order in the court below, and continued at every stage of the trial, and in respect to all matters affecting its earning capacity, its fixed charges, its operating expenses, its sources of revenue, and the value of the property itself; and the question is, was the prima facie character of the order of the commission swept away and overcome by the evidence, and was it shown by such evidence that the rates established were so unjust and unreasonable as to be confiscatory in their nature, so that when the order was enforced it operated to destroy defendant's rights of property?

Of course, this could be done by fixing a fair and reasonable joint rate for the two companies interested for the transportation of coal to points on defendant's road south of Minneapolis, and then awarding too large a proportion or percentage of the joint earnings to the Duluth and Minneapolis carrier.   And this is what is complained of, for the commission gave to the carrier last mentioned

one dollar per ton,—exactly what it had received under the voluntary traffic arrangement. The order or tariff of rates made and fixed by the commission being prima facie evidence that such rates are equal and reasonable, there is nothing in the claim made by counsel that it was the duty of the court below to make a specific finding as to the cost of transacting the business involved in this litigation. And, if it had been, the proper practice, where findings are not sufficiently specific, is to request that they be made so. Cummings v. Rogers, 36 Minn. 317, 30 N. W. 892.

That the commission had made the order complained of stood admitted in the defendant's answer herein, and it therefore became necessary for defendant to introduce competent and sufficient evidence at the trial to meet and overcome the prima facie case made by the relator. This counsel attempted to do by calling as witnesses several persons engaged in railroading, among them Mr. Nay, who was defendant's auditor. We shall not cumber this opinion with tables of figures as presented by this witness, but will simply say that appellant's capital stock outstanding June 30, 1899, the end of its fiscal year, was $10,000,000, while its bonded indebtedness was $17,800,000, the bonds bearing interest ranging from four to seven per cent. per annum, the total interest per year aggregating $659,540. The total cost of the road up to the date last given was $23,390,560.15, including all equipment. The gross earnings, interest from investments, interest and exchange from trackage and other rentals for the year,—that is, the total receipts,— were $2,696,601.31. The total expenditures for the year were $2,237,939.27, the net income being $458,662.04. The witness testified that, if the whole of this sum had been devoted to the payment of dividends upon capital stock, it would be about four and one-half per cent.; and he also testified that it would not be practicable, in his opinion, to apply every dollar of the net income to the payment of stock dividends. We presume this to be true, but why it is so, and to what use a part of the net income would necessarily be diverted from stock dividends, the witness omitted to state.

He was then examined as to the earnings of the various operating divisions on the road, testifying to an actual deficit when compared with operating expenses. He was asked the average cost of

operation per ton per mile in the Western division, including all
kinds of merchandise, and fixed it at 1.293 cents,—a little over one
and one-quarter cents,—while the revenue returned under the rate
fixed by the order would be but .779 of a cent, the net loss being a
little over one-half cent per ton per mile.  He then took up another
division, and on this, according to the figures, the loss in hauling
coal in car-load lots would be about two cents per mile per ton.
The cost of operating other divisions per mile was also shown, and
on one was but .704 of a cent per ton per mile.  And the average
cost per ton per mile for carrying freight on the entire system was
given by this witness as 1.112 cents for the year ending June 30,
1899.   This included all business, through and local, the latter be-
ing estimated at one-fourth of all.   While the revenue derived for
carrying coal at the rate fixed by the commission, and to the sta-
tions named in the order, would be 1.118 cents, this would be but
.006 of a cent per ton per mile more than the average cost for all
classes of freight on the entire system.

Upon the face of these figures, and accepting them as correct for
the purpose of deciding this case, it would seem that the rates fixed
could not be sustained.  But, when we scrutinize the testimony of
this witness and other persons upon which defendant relies, we
discover that the court below was right when it held that the prima
facie character of the order had not been overturned by the proofs;
for Mr. Nay's estimate as to the expense per mile is clearly wrong.
He includes in his estimate of expenses for operation the dividends
which were declared upon stock and interest paid upon bonds.   He
was asked upon cross-examination how he got at the amount of
1.112 cents as the average cost for carrying freight on the entire
system, and answered:

"I arrived at that by taking the total operating expenses, taxes,
interest on bonded debt, dividends on stock, amounts paid for
trackage and other rentals, aggregating $2,532,522.60, and deducted
therefrom receipts from interest and exchange, interest on invest-
ments, and trackage and other rentals received, amounting to $196,-
596.95, leaving a total net cost of $2,335,925.65.   I found that the
freight earnings were 74.41 per cent. of the gross earnings, and I
took 74.41 per cent. of the net cost, which made $1,738,162.28, as

chargeable to freight, and by dividing that by the total tons one mile (156,379,613) gives 1.112 cents."

And when questioned as to his methods when ascertaining the cost per mile of operating each of the divisions before mentioned, and concerning which we have given his figures, his answer was in every instance that he included as operating expenses dividends paid upon stock shares and interest paid, with one exception. Referring to one division (the Southwestern), the questions put to Mr. Nay, and his answers, were as follows:

"Q. So that is the estimate you have made. The Southwestern Division gets a credit of fifty per cent. more than the actual earnings on a mileage prorate? A. Yes, sir. Q. And you say you have charged it with no dividend? A. No, sir. Q. On the other divisions you have included the dividends? A. Yes, sir. Q. Now, on what stock have dividends been paid? A. On the first preferred and second preferred. Q. The first preferred stock has been retired, has it not? A. It was retired June 1. Q. And you have not included it in your capitalizations? A. No, sir. Q. Your statement that there was $10,000,000 of stock outstanding does not include the first preferred? A. Does not include the first preferred. Q. What was the amount of the first preferred? A. $2,500,000. Q. What dividends were paid on the second preferred? A. There has been $180,000 paid on the second preferred. Q. What percentage? A. That would be four and one-half per cent. Q. Four and one-half? A. Yes, sir; two per cent. the first dividend, and two and a half the second."

It seems to us very clear that in estimating the operating expenses of a railway, stock dividends cannot be included. They are no part of the cost of operation. Nor should they be included, under any of the authorities, when ascertaining the reasonableness of a rate tariff. This is in no manner denying the defendant's right to earn sufficient to pay its operating expenses, interest upon its bona fide bonded indebtedness, and a proper dividend upon its lawfully issued stock shares or value of the investment. We must not be understood by this last remark as intimating that defendant's bonded indebtedness and stock shares, as testified to, are not bona fide and proper in every respect; for that stands admitted by all parties hereto. We think, taking Mr. Nay's figures only, that it very conclusively appears that if all local freight, of every class and

description, was carried at the rates fixed by the commission for coal in car-load lots, the earnings would be ample to meet the operating expenses, interest upon the bonded indebtedness (although upon a part thereof the rate is very high), and a fair rate of interest upon the investment. This is evident from the table prepared by the state expert, Mr. Yapp, from figures submitted by Mr. Nay. We need not specifically allude to these tables, but one shows the total number of tons of hard coal received from Duluth for year ending June 30, 1899; Minneapolis & St. Louis Railroad's proportion of revenue and average rate per ton per mile; also loss of revenue had commissioners' rates been in effect. Had the new rates been in effect that year, the loss of revenue to defendant, according to this table in evidence, and not disputed, would have amounted to less than $1,500. This is a very slight depreciation of revenue, when we discover that the total earnings on freight on the divisions affected by the order amounted to over $700,000 for that fiscal year.

There is another suggestive thing appearing in one of these tables, also undisputed. The estimated cost per ton per mile for carrying freight on that part of defendant's road lying in this state, and also for the whole line,—figures furnished by defendant,—appears for the years 1890 to 1893, inclusive. The most expensive year of the four (for Minnesota) was 1892. Cost per mile per ton .695 of a cent; that is, less than seven-tenths of a cent. For the entire system the expensive year was 1891. Cost per mile per ton .743 of a cent; less than eight-tenths of one cent. A suggestion that the rapid increase in cost of operation from 1893 to 1898 needed explanation is hardly necessary. But a part of the explanation was furnished when it appeared that these stock dividends were included in the item of operating expenses.

It appeared from these tables, prepared from figures furnished by defendant corporation, and not contradicted by its witnesses, that on one division the average cost per ton per mile was .907 of a cent, while on the entire system or line it was but .709 of a cent,— a trifle more than seven-tenths of a cent; in other words, about four-tenths of a cent less than the commissioners' rate. It should be said, however, at this point, that Mr. Yapp, in making these computations, confined operating expenses to actual expenses, in-

cluding money paid out for taxes and for rentals. He did not include interest on bonds or dividends on stock. Counsel for defendant claims something for testimony as to rates received by other roads for this class of service, and by comparison asserts that the tariff complained of is too low. This method of ascertaining the reasonableness of the tariff is valueless, because it may be that the other roads are exorbitant in their charges. That another road is receiving, say, one dollar per ton for carrying coal one hundred miles, while defendant receives but seventy-five cents for the same distance, may prove that the other road charges too much, and should be looked after by the commission; but this kind of evidence does not demonstrate that defendant is receiving too little, and that the commission has fixed an unfair and unreasonable tariff of rates on its line.

Another matter may well be referred to, and that is the so-called "commercial necessity," before referred to, namely, the application of principles in fixing rates which are forced upon carriers by various conditions and situations, and, as said in the Steenerson case, appear at first glance to amount to discrimination between towns and commodities. As was there stated, this rule is an everyday practice with carriers, and that it is well known and justified in business circles, and is tolerated and approved because of the necessity, cannot be overlooked by the courts, any more than it is by legislatures or by commissioners, or by the carriers themselves, when making schedules of rates for the transportation of either passengers or merchandise. And if this business policy actuates and influences the carriers themselves to disregard a rule of strict comparison and strict equality, as between bulk or weight or value of the various commodities, and to carry one article many more miles for the same money than they do another, although there may be no substantial difference in bulk or weight or otherwise, between these two articles, and this is approved by the public as good business policy under the circumstances, there is no reason why the legislature or the commission should not be actuated, influenced, and governed by the same rule. And there is no reason why the courts should not heed and act upon it when called upon to consider and review an order of the character of the one at bar.

This rule has constantly been recognized and acted upon by rail-roads, and has often been referred to and countenanced by the interstate commerce commission when considering the question of long and short hauls. It is this rule which governs when considering the long haul as against the short, and permits the higher rate per mile for the latter, and it also allows a greater rate to be charged upon certain classes of freight than upon other classes, where there is no material difference in weight, bulk, value, or cost of transportation, and is justified by the same argument.

At this trial it appeared from the evidence—and it is a matter of common knowledge—that articles for carriage as freight are classified somewhat arbitrarily by railway companies, and a different rate fixed for the transportation of each class, coal being in a very low rate class. Some articles—wood, for instance—were voluntarily carried in car-load lots for less than coal would be, if the order was complied with, and, if Nay was right in his figures, at less than cost. It also appeared that defendant under the old tariff of rates discriminated between stations on its lines,—that is, its freight mileage was not a uniform rate per mile; the result being that for some stations a lower rate prevailed than for others, the haul being the same as to distance. In view of the fact that freight is classified, that different tariff rates are fixed for each class, and that coal is placed by carriers themselves in the lowest class,— that is, in the class which is usually transported at the lowest rate, —it was, in our opinion, insufficient for defendant to rest its legal duty to overcome the prima facie character of the order by simply attempting to show that, if all classes of freight were carried at the rates fixed by the order, the revenue of the defendant road would be insufficient to meet its obligations, and therefore that the rate was unreasonable and confiscatory. The fact is that all classes of freight are not to be carried at this rate, unless defendant chooses to do so. It would seem to follow that defendant did not go far enough in its evidence on this point. Again, recognizing fully the commercial necessity before mentioned, evidence should have been introduced on which a finding could have been based to the effect that there was no class of traffic on defendant's road upon which rates could be made, or actually had been made, and were

being collected, which would or had made good the loss of revenue resulting from the order. Nothing of this sort was attempted.

One other suggestion in respect to defendant's failure of proof in rebuttal of the order. The rule laid down in the Steenerson case for ascertaining and determining whether the rates fixed are reasonable, and not confiscatory, was wholly ignored. Defendant's counsel did show what the road had cost up to June 1, 1899. This included every item of expenditure from the start. Cost of construction, repairs, equipment, additions, and all other items were included. But not a particle of proof was presented as to present value or cost of reproduction. Nor did counsel pay any attention to what has been said by the court of last resort on this particular subject. We quote:

"But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders." Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418.

This is but a reiteration of what had theretofore been said in Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028. Nor do we understand that in the very recent opinion of the same learned court (Chicago, M. & St. P. Ry. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336), there has been any departure or intimation thereof from what had been said in the earlier cases. It was there remarked that the state

"Court proceeded upon the theory that a comparison of the actual gross receipts of the company from its South Dakota local business with those which it would have received if the rates prescribed by the defendants had been in force was sufficient to determine the question of the reasonableness of these latter rates, and instituted such comparison with respect to the four years preceding the commencement of this suit. Now, it is obvious that the amount of gross receipts from any business does not of itself, determine whether such business is profitable or not. The question of expenses incurred in producing those receipts must be always taken into account, and only by striking the balance between the two can it be determined that the business is profitable. The gross re-

ceipts may be large, but if the expenses are larger surely the business is not profitable. It cannot be said that the rates which a legislature prescribes are reasonable if the railroad company charging only those rates finds the necessary expenses of carrying on its business greater than its receipts."

It would seem self-evident that, if the gross receipts of a business are less than are the expenses of conducting that business, there is a loss to the party carrying it on, and so the decision was clearly right, but in no manner does it affect the case before us.

Referring again to the rule laid down in the Steenerson case, and that established in the Smyth case, it is to be observed that the latter is more liberal, and, if adopted by us for the purposes of this case, defendant should not complain. It is evident that there was a lack of proof as to the present, as compared with the original, cost of construction, unless, as urged by counsel, we assume that either the amount of stock and bonds outstanding or the construction account represent it. We decline to act on this assumption, and we do not regard the authority cited (Ames v. Union Pac. Ry. Co., 64 Fed. 177) as so holding.

Judgment affirmed.