STATE OF NORTH DAKOTA EX REL., T. F. McCUE, ATTORNEY GEN-
ERAL v. NORTHERN PACIFIC RAILWAY COMPANY.

Opinion filed April 16, 1909.

**Constitutional Law — Regulation of Railroad Rates — Due Process of
Law.**

1. Chapter 51, page 73, Laws 1907, amending and re-enacting sec-
tion 4395, Rev. Codes 1905, prescribing maximum coal rates for the
transportation by common carriers of coal in carload lots within the
state, is not violative of section 8, article 1 of the constitution of the
United States, known as the "commerce clause," which confers upon
congress the power "to regulate commerce with foreign nations, and
among the several states, and with the Indian tribes;" nor does it
violate the fourteenth amendment of the federal constitution, nor
section 13 of the constitution of North Dakota, providing, in effect,
that no person shall be deprived of life, liberty or property without
due process of law.

**Same — Power of Legislature.**

2. The legislative assembly possesses the undoubted power, under
section 142 of the constitution of North Dakota, to prescribe maxi-
mum rates for the transportation by common carriers of commodities
between points within the state, provided the rates thus prescribed
are reasonable.

**Same — Evidence — Statute Presumed Valid.**

3. The act in question is presumptively valid, and the burden is
upon the carrier to prove that the rates therein prescribed are clearly
unreasonable.

**Same — Statutory Construction.**

4. Where the constitutionality of a law is made to depend upon
the existence or nonexistence of some fact or state of facts, the
determination thereof is primarily for the legislature, and the court
will acquiesce in its decision, unless it clearly appears that such de-
cision was erroneous.

**Same — Transportation of Coal.**

5. Evidence examined, and *held* not sufficient to overcome the
prima facie presumption that the rates prescribed by said act are rea-
sonable.

**Same — Freight Rates — Determination of Reasonableness.**

6. The proper test as to whether the rates thus fixed are reason-
able or unreasonable is not whether the rate fixed on the particular
commodity is sufficiently high to enable the carrier to earn a fair
compensation after allowing for the legitimate cost to the carrier of

transporting the same, but whether, under such rates, it will be enabled from its total freight receipts on all its intrastate traffic to earn a sum, above operating expenses reasonably necessary for such traffic, sufficient to yield a fair and reasonable profit upon its investment. It is within the power of the legislature to reduce the freight on a particular article, provided the carriers are enabled to earn a fair profit upon their entire intrastate business.

Application by the State, on the relation of T. F. McCue, Attorney General, against the Northern Pacific Railway Company for injunction. Writ granted.

*T. F. McCue, Atty. Gen.,* and *E. P. Kelly,* for plaintiff.

*Ball, Watson, Young & Lawrence* and *C. W. Bunn,* for defendant.

FISK, J. By chapter 51, p. 73, Laws 1907, which became effective July 1, 1907 the legislative assembly of this state amended and re-enacted section 4395 Rev. Codes 1905, which establishes maximum coal rates for the transportation by common carriers of car load lots of coal within the state. It is conceded that this statute has at all times been wholly ignored by defendant and other carriers of freight in this state by their charging and exacting for such service higher rates than those prescribed therein; their contention being that said statute is unconstitutional, and hence void, for the reason, among others, that the rates thus prescribed are unreasonably low and confiscatory, and hence said act is violative of the fourteenth amendment to the federal Constitution, and section 13 of the state Constitution. On August 7, 1907, the Attorney General filed, by permission of this court, a petition, duly verified in which are set forth the essential facts, showing defendant's violation of said statute, and praying that this court issue its prerogative writ of injunction to restrain defendant, its agents and employes, from committing the acts complained of. Such petition is entitled in the name of "State of North Dakota ex rel. T. F. McCue, Attorney General, as Plaintiff, against Northern Pacific Railway Company, as Defendant." Similar proceedings in all respects were at said time also commenced against the Great Northern Railway Company and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company. Pursuant to plaintiff's motion in that behalf, an order to show cause returnable on September 16th was issued by the chief justice requiring defendant to appear and show cause, if any it had, why such writ should not issue permanently enjoining it from committing the acts complained of. In response to such order to show cause,

defendant made its return, setting forth, in substance, that chapter 51, Laws 1907, aforesaid is void for the reasons: (1) That it violates the commerce clause of the Constitution of the United States (article 1, § 8), which provides that: "Congress shall have power * * * to regulate commerce with foreign nations and among the several states and with the Indian tribes." (2) The maximum rate fixed by said act is "unremunerative, unreasonable, inadequate, and confiscatory, and violates the fourteenth amendment of the federal Constitution, also section 13 of the state Constitution." Such return also alleges that the maximum rates thus fixed by chapter 51 are greatly less than corresponding rates as fixed by law in Minnesota and by the railroad commissioners in the states of Iowa and Illinois, and a comparison of the rates in these various states is set out therein. By stipulation of counsel the clerk of this court was appointed referee for the purpose of taking and reporting to the court the testimony offered by the respective parties upon the issues thus framed. On November 20, 1907, such referee duly qualified by taking the oath required by law, and on the following 14th day of July, 1908, the taking of testimony was commenced at the general offices of defendant in the city of St. Paul, Minn., and was concluded on December 16, 1908, at Fargo, in this state and the same was thereupon reported to the court and on March 29, 1909, the cause was finally submitted for decision.

The Attorney General advances the following propositions: "(1) The Legislature has the right to regulate and fix rates for the transportation of coal in this state. (2) Presumptively, chapter 51, Laws 1907, is valid. (3) The burden of proving that the rates are unreasonable is upon the defendant. (4) The proposed rate is not unreasonable, even though it is not compensatory, provided the defendant is earning a fair profit upon its entire business in this state. (5) Chapter 51, Laws 1907, in no way amounts to a regulation of interstate commerce."

The correctness of the first proposition is not challenged by defendant's counsel, provided the same is qualified so as to restrict such right to the regulating and fixing of rates which are reasonable; and the Attorney General concedes that it should be thus qualified. The rule is, of course, too well settled to admit of dispute that the Legislature has the power to fix and regulate rates to be charged by common carriers upon intrastate traffic, provided such rates are not confiscatory, but are reasonably remunerative. Section 142 of

our Constitution expressly confers such power upon the Legislature. Upon the second and third propositions, which are that the statute in question is presumptively valid, and that the burden of proving that the rates therein fixed are unreasonable is upon defendant, counsel for the railway company, while stating that these questions are not of controlling importance in view of the state of the proof, argues that such presumption does not obtain in this case, and that the burden is upon the state to show that the rates fixed by said statute are reasonable. No authorities are cited in support of these contentions and we believe none exist. We know of no exception to the general rule that a statute is presumptively valid, and will be upheld unless it clearly contravenes the organic law of the state or of the United States, or a valid statute or treaty thereof. This is so elementary as to require the citation of no authorities, but see Sutherland on Statutory Construction, p. 417; 2 Lewis' Sutherland Statutory Construction (2d Ed..) § 497; In re Spencer, 149 Cal. 396, 86 Pac. 896, 117 Am. St. Rep. 137, 9 Am. & Eng. Ann. Cas. 1105. From the opinion in the latter case, we quote: "The presumption always is that an act of the Legislature is constitutional and, when this depends on the existence or nonexistence of some fact or state of facts, the determination thereof is primarily for the Legislature, and the courts will acquiesce in its decision, unless the error clearly appears. Bourland v. Hildreth, 26 Cal. 184; State University v. Bernard, 57 Cal. 612; Matter of Madera Irrigation District, 92 Cal. 310, 28 Pac. 272, 675, 14 L. R. A. 755, 27 Am. St. Rep. 106; Sinking Fund Cases 99, U. S. 718, 25 L. Ed. 496; 1 Tiedeman on Police Power, 10, note; Cooley on Constitutional Limitations (7th Ed.) 228. 'Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.' Sinking Fund Cases, 99 U. S. 718, 25 L. Ed. 496. 'The delicate act of declaring an act of the Legislature unconstitutional and void should never be exercised unless there is a clear repugnancy between the statute and the organic law.  *  *  *  In a doubtful case the benefit of the doubt is to be given to the Legislature; but it is to be remembered that the doubt to which this rule of construction refers is a reasonable doubt,

as distinguished from vague conjecture or misgiving.' Bourland v. Hildreth, 26 Cal. 184."

This brings us to the main and controlling proposition in the case, which involves the question of the reasonableness of the rates thus established. Does the evidence clearly show that such new rates, if enforced, will necessarily prevent the carrier from earning and receiving a fairly reasonable income upon its legitimate investment, or, the present value of its property, after paying all necessary operating expenses? If so, the act cannot be sustained. The authorities to this effect are unanimous.

It is asserted by counsel for defendant that the rates fixed by chapter 51 would not even yield sufficient returns to defray the operating expenses alone, much less to pay a reasonable rate upon such investment. This assertion is predicated, however, upon two assumptions, neither of which are in our opinion warranted. Starting with the erroneous assumption that the act merely fixes rates for the transportation of lignite coal, counsel throughout the trial and in their argument further assumed that the test as to the reasonableness of these rates is whether the freight receipts derived from hauling lignite coal between points in this state are sufficient to pay, in addition to the operating expenses of this particular traffic, a reasonable compensation or profit. An examination of the act in question will serve to demonstrate the fallacy of the first assumption. Regarding the other assumption a more extended consideration is demanded.

For the purpose of showing the unreasonableness of the rates fixed, will defendant be permitted to single out the one commodity to which the rates apply, and prove, as it has attempted to do in this case, that the transportation thereof is a losing proposition to the carrier? Or must it not show that if such rates are enforced it will be unable from the total freight receipts to earn a sum above operating expenses sufficient to yield a fair and reasonable profit upon its investment, provided the road was economically and efficiently constructed and operated? It was conceded on oral argument by defendant's counsel, in effect, that under the latter test it has no defense. The proof shows that the lignite coal shipments form an infinitesimal portion of the entire freight shipments in the state, and hence that the difference between the freight receipts based upon the rates sought to be enforced would not materially affect the total receipts from all freight shipments within the state. This being true, has defendant any valid ground for complaint against the act in

4.

question? In other words, does such act contravene either of the above-cited provisions of the federal and state Constitutions? As above stated, every presumption will be indulged in favor of the act, and hence it must be presumed that the Legislature carefully considered the foregoing facts before enacting such rates. If it is permissible for defendant to adopt the test which it has adopted for determining the reasonableness of such rates, then, upon the same reasoning, it would be proper, in order to show the inadequacy of rates generally, to prove that certain or all of its branch lines are unremunerative. This clearly could not be done. Interstate Commerce Commission v. Louisville & N. R. Co., (C. C.) 118 Fed. 613; St. Louis Railway Company v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, affirming same case in 54 Ark. 101, 15 S. W. 18, 11 L. R. A. 452. In the latter case the United States Supreme Court, among other things, said: "It therefore appears that the allegations made and the evidence offered did not cover the company's railroad as an entirety, even in the state of Arkansas, but were made in reference to that portion of the road originally belonging to the St. Louis, Arkansas & Texas Railway Company and extending from the northern boundary of Arkansas to Fayetteville in said state. In this state of facts, we agree with the views of the Supreme Court of Arkansas, as disclosed in the opinion contained in the record, and which were to the effect: That the correct test was as to the effect of the act on the defendant's entire line, and not upon that part which was formerly a part of one of the consolidating roads; that the company cannot claim the right to earn a net profit from every mile, section, or other part into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such part would be unremunerative; that it would be practically impossible to ascertain in what proportion the several parts should share with others in the expenses and receipts in which they participated; and, finally, that to the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated as against all its legitimate expenses under the operation of the act within the limits of the state of Arkansas."

Upon parity of reasoning it would seem that the carrier may not be permitted to single out one commodity and insist that the tariff of rates for the transportation of the same is unreasonable and confiscatory without being required to show that under the operation of

such rates it will be unable to derive from its entire freight business within the state a just and reasonable profit. In an able article on "State Regulation of Railroad Rates and Charges," by Dean Bruce, in 62 Central Law Journal, 458, it is, among other things, said: "Rates, however, are not necessarily unreasonable nor is their enforcement a taking of property without due process of law, merely because, if such rates were applied to all freight, the road would be operated at a loss. The tariff therefore for coal in car load lots and for similar products of general consumption may, when such products make up but a comparatively small proportion of the general freight carried, be fixed at a comparatively low rate, and one which, if generally applied to all products, would leave no profit to the company. So, too, it has been held that the mere fact that a railway line, operated as a part of a large system, does not by itself pay expenses, does not justify the charging of unreasonable rates in a shipment over such system"—citing State v. Minneapolis & St. Louis R. Co., 80 Minn. 191, 83 N. W. 60, 89 Am. St. Rep. 514; Minneapolis & St. Louis R. Co. v. State of Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151; Interstate Commerce Commission v. Louisville & N. R. Co. (C. C.) 118 Fed. 613. The federal Supreme Court in affirming the Minnesota Court, held that it is not beyond the power of the commissioners of railroads to reduce the freight upon a particular article, provided the company is permitted to earn a fair profit upon the entire business and that the burden of proof is upon the carrier to impeach the action of the commission. Among other things, the court said: "Notwithstanding the evidence of the defendant that, if the rates upon all merchandise were fixed at the amount imposed by the commission upon coal in car load lots, the road would not pay its operating expenses, it may well be that the existing rates upon other merchandise, which are not disturbed by the commission, may be sufficient to earn a large profit to the company, though it may earn little or nothing upon coal in car load lots. In Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, we expressed the opinion that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons or property wholly within its limits must be determined without reference to the interstate business done by the carrier, or the profits derived from it; but it by no means follows that the companies are entitled to earn the same percentage of profits upon all classes of freight carried. It often hap-

pens that, to meet competition from other roads at particular points, the companies themselves fix a disproportionately low rate upon certain classes of freight consigned to these points. The right to permit this to be done is expressly reserved to the Interstate Commerce Commission by section 4 of that act (Act Cong. Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), notwithstanding the general provisions of the long and short haul clause, and has repeatedly been sanctioned by decisions of this court. While we have never decided that the commission may compel such reductions, we do not think it beyond the power of the state commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit upon their entire business, and that the burden is upon them to impeach the action of the commission in this particular. As we said in Smyth v. Ames: 'What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.' * * * In exercising its power of supervising such rates, the commission is not bound to reduce the rates upon all classes of freight, which may perhaps be reasonable except as applied to a particular article; and if, upon examining the tariffs of a certain road, the commission is of opinion that the rate upon a particular article or class of freight is disproportionately or unreasonably high, it may reduce such rate, notwithstanding that it may be imposible for the company to determine with mathematical accuracy the cost of transportation of that particular article as distinguished from all others. Obviously such a reduction could not be shown to be unreasonable simply by proving that, if applied to all classes of freight, it would result in an unreasonably low rate."

Two cases very similar to the case at bar. arose in the state of Florida as late as 1904. The railroad commission of that state fixed local rates for the transportation of phosphate, which rates were ignored by the carriers. The state, through its Attorney General, invoked the original jurisdiction of the Supreme Court for the issuance of a peremptory writ of mandamus to enforce the order of the commission fixing such rates. The respondents' return in those cases raised two issues for determination: (1) Whether the rates sought to be enforced are in and of themselves unreasonable; and (2) whether said rates, taken in connection with the other rates en-

forced by the state railroad commission on local business, would deprive the railway of its property without due process of law, or deny to it the equal protection of the law within the inhibition of the federal Constitution. It was held that the burden was upon the respondents to establish the affirmative of both of these propositions, and that they failed to establish either. These cases are both entitled State ex rel. Ellis v. Atlantic Coast Line R. Co., and are reported in 48 Fla. 146, 150, 37 South. 657. Both cases were taken by writ of error to the federal Supreme Court and affirmed by unanimous decisions. See 203 U. S. 256, 261, 27 Sup. Ct. 108, 51 L. Ed. 174.

In the light of the well-settled rules above announced, does the proof warrant this court in holding that these statutory rates are unreasonable and confiscatory, and hence that the act establishing the same is unconstitutional and void? We are clear that this question must be answered in the negative. Defendant attempted to show the invalidity of such rates: First, by a comparison of such rates with the rates in force in other states for the transportation of soft coal; and, second, by conclusions testified to by various witnesses to the effect that the cost of transporting lignite coal in this state is more than the freight receipts derived from such traffic. It would be a needless task to review this testimony at length. Suffice it to say that such proof comes far short of overcoming the prima facie presumption that such statutory rates are reasonable and valid. Regarding the comparison of the rates in other states with those fixed by the act in question, we call attention to the language of the Minnesota court in State v. Minneapolis & St. Louis R. Co., 80 Minn. 191, 83 N. W. 64, 65, 89 Am. St. Rep. 514, as follows: "Counsel for defendant claims something for testimony as to rates received by other roads for this class of service, and by comparison asserts that the tariff complained of is too low. This method of ascertaining the reasonableness of the tariff is valueless, because it may be that the other roads are exhorbitant in their charges. That another road is receiving, say, $1 per ton for carrying coal 100 miles, while defendant receives but 75 cents for the same distance, may prove that the other road charges too much, and should be looked after by the commission; but this kind of evidence does not demonstrate that defendant is receiving too little, and that the commission has fixed an unfair and unreasonable tariff of rates on its line." Also to the language of the Circuit Court of the United States in Smyth v. Ames, 64 Fed. 165, and approved by the federal Supreme Court in

169 U. S. 540, 18 Sup. Ct. 431, 42 L. Ed. 819, as follows: "Comparisons therefore between the rates of two states are of little value, unless all the elements that enter into the problem are presented." Even if this character of evidence would be admissible when a proper foundation has been laid for its introduction by showing a similarity of conditions in the other states to those existing in this state, no such proof was offered. Furthermore, the proof of the foreign rates consisted of certain copies of schedules of such rates, and from such copies, which are in no way authenticated, Defendant's Exhibit 4, which purports to be a comparison of coal rates in various states, including North Dakota, was compiled by rate clerks in defendant's general offices. Not a scintilla of proof is offered to show that such foreign rates are reasonable. For these reasons such proof can be given no effect by this court. Aside from the attempted proof of the unreasonableness of these rates by comparison with rates in other states, defendant's proof of such alleged unreasonableness consists merely of conclusions testified to by various witnesses relative to the cost of transporting lignite coal over its lines of road. As before stated, these conclusions are based upon the erroneous assumption that the new rates relate merely to lignite coal shipments; but, conceding that such assumption is, in practical effect, accurate, there is no contention made that, under the operation of such rates, the defendant will not be able upon its entire intrastate traffic to earn, in addition to its gross operating expenses, a sum amply sufficient to yield a reasonable income upon its investment. This being true, defendant, under the foregoing authorities, cannot successfully urge the unconstitutionality of said law.

Defendant's counsel contend, however, in effect, that each class of freight must be required to bear its share necessary to insure to the carrier a reasonable compensation for its service to the public. This argument, in a qualified sense, is sound. It should, of course, be required to bear its just and equitable burden; but it is everywhere held proper and just that freight commodities should be classified in fixing rates, and that a reasonable rate for one class may be entirely unreasonable as to another class, although both are identical as to bulk and weight, and the expense to the carrier is as great for the transportation of one as the other. What is a reasonable and equitable rate for one commodity may be wholly unreasonable and inequitable as to another. Coal, being a necessity and in general use by the public, is, and justly should be, favored in making

up rate classifications and schedules, and it is perfectly legitimate to permit the carrier, in order to earn a reasonable compensation upon its entire intrastate traffic, to charge and collect a high enough rate on general traffic to make up any deficiency caused by a lower rate on special commodities, such as coal. Whether a rate on any special commodity which is so low as to entail a positive loss to the carrier, in so far as the transportation of such particular commodity is concerned, is necessarily invalid, we are not here required to decide, as we consider the evidence insufficient, for reasons above stated, to disclose the existence of any such conditions. The federal Supreme Court, in Minneapolis & St. L. R. Co. v. Minn., supra, fully sustains us in these views. We again quote from the opinion: "* * * We do not think it beyond the power of the state commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit upon their entire business, and that the burden is upon them to impeach the action of the commission in this particular." In the nature of things it is impossible to say, with any degree of accuracy, what the effect of the enforcement of such statutory rates will be, and there can be no accurate test except the test of experience. The natural effect of cheaper rates will be to increase the demand for native coal all over the state, and this may result in enabling the carrier to transport such article in train load lots, and hence at greatly decreased expense.

It is finally urged by defendant's counsel that the act in question violates the interstate commerce clause of the federal Constitution. Their argument is necessarily predicated upon the assumption that state regulation of local rates on interstate lines amounts to an interference with interstate commerce, as the act assailed, upon its face, merely purports to establish maximum rates for transporting coal in car load lots between points within the state. This question is not open to debate, as the court of last resort in this country has repeatedly held adversely to counsel's contention. See Louisville & N. R. Co. v. Kentucky, 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298, and cases cited. In that case the court, speaking through Mr. Justice Shiras, said: "The final contention, that section 218 of the Constitution of Kentucky operates as an interference with interstate commerce, and is therefore void, need not detain us long. It is plain that the provision in question does not in terms embrace the case of interstate traffic. It is restricted in its regulation to those who own or operate a railroad within the state, and the long and short

distances mentioned are evidently distances upon the rail-road line within the state. The particular case before us is one involving only the transportation of coal from one point in the state of Kentucky to another by a corporation of that state. It may be that the enforcement of the state regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce; that the interference with the commercial power of the general government, to be unlawful, must be direct, and not the merely incidental effect of enforcing the police powers of a state. New York, L. E. & W. R. Co. v. Pennsylvania, 158 U. S. 431, 15 Sup. Ct. 896, 39 L. Ed. 1043, 1045; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup Ct. 532, 41 L. Ed. 953. A discussion of this subject will be found in the opinion of this court in Louisville & N. R. Co. v. Kentucky, 161 U. S. 701, 16 Sup. Ct. 714, 40 L. Ed. 849, where the same conclusion was reached."

It is but fair to counsel for defendant to state that they concede that up to this time the decisions of the United States Supreme Court on this point are uniformly opposed to their contention. Even if we were disposed to entertain the views expressed by Judge Lochren in Perkins v. N. P. Ry. Co. (C. C.) 155 Fed. 453, which we are not, we should feel it our duty, as did Judge Lochren, to yield to the judicial utterances of the final arbiter on this question.

The writ will issue as prayed for by plaintiff. All concur.