INTERSTATE COMMERCE COMMISSION v. LOUISVILLE & N. R. CO. et al.

(Circuit Court, S. D. Georgia, E. D.   July 1, 1902.)

1. CARRIERS—SUIT TO ENFORCE ORDERS OF INTERSTATE COMMERCE COMMISSION—BURDEN OF PROOF.

The conclusions of the interstate commerce commission, based upon its findings of fact that charges made by a railroad company are unjust and unreasonable or unlawfully discriminating, are presumed to be well founded and correct, and in a suit to enforce its orders the burden rests upon the company to show them to be erroneous.

**2. SAME—DISCRIMINATION IN RATES.**

Conceding that a railroad company may, to a reasonable extent, so adjust its rates as to promote its own interest by favoring and building up a seaport on its own line at the expense of another on a rival road, it cannot, with that purpose, adopt rates unreasonable in themselves, nor which are unduly preferential to its own port and unduly prejudicial to the other or to the public; and rates upon products shipped from points on its line where there is no competition, which are so grossly discriminating as to be prohibitory of shipments to the latter place, which affords the better market, adopted for the purpose of compelling the shipment of such products in the opposite direction to its own port, are unlawful, not only as unduly discriminating between the two cities, but as making a discrimination injurious to the public.

**3. SAME.**

The fact that a railroad line operated as a part of a large railway system, considered as a separate road, fails to pay expenses, does not justify the charging of unjust and unreasonable rates nor undue discrimination in rates.

**4. SAME—INTERSTATE COMMERCE COMMISSION—JURISDICTION.**

An advanced rate of freight on certain articles, filed with the interstate commerce commission, and put into effect pending a hearing before the commission on the legality of the rate previously in force, is properly before the commission for consideration on such hearing.

**5. SAME—JOINT THROUGH RATE—SEVERAL RESPONSIBILITY OF COMPANIES.**

The making of a through rate on interstate shipments by the joint action of connecting railroads is the act of each, and brings each within the scope of the interstate commerce act, and renders it responsible for such rate, without regard to the proportion thereof received for its own service.

**6 SAME—UNREASONABLE AND DISCRIMINATING RATES—EVIDENCE CONSIDERED.**

Evidence examined, and *held* to sustain the findings and conclusions of the interstate commerce commission that rates charged on through shipments of naval stores and uncompressed cotton from points on the Pensacola & Atlantic Division of the Louisville & Nashville Railroad to Savannah were in violation of sections 1 and 3 of the interstate commerce act, as being both unjust and unreasonable in themselves and unduly discriminating.

In Equity. Suit to enforce orders of the interstate commerce commission.

L. A. Shaver and William W. Gordon, Jr., for the commission.
Ed Baxter, for respondents.

SPEER, District Judge. The interstate commerce commission brought this proceeding against the Louisville & Nashville Railroad Company, the Florida Central & Peninsular Railroad, and the Savannah, Florida & Western Railway Company. An injunction is sought to restrain the collection of certain rates exacted on shipments to Savannah of naval stores and uncompressed cotton. These are blanket or group rates, enforced upon shipments of these commodities from all points on the Pensacola & Atlantic Division of the Louisville & Nashville properties. The suit originated as follows: The Savannah Bureau of Freight and Transportation and nine other complainants, who described themselves as "general merchants, naval stores manufacturers, and cotton shippers," made complaint to the commission against the defendant companies. The complainants allege that they and all other shippers of cotton and naval stores from the points mentioned had been subjected to undue and unrea-

sonable prejudice and disadvantage because of these rates. The principal offender, it is alleged, was the Louisville & Nashville Railroad Company. The lines of this company begin at Louisville and Cincinnati, traverse the states of Kentucky, Tennessee, Alabama, and a portion of Florida. At a station known as "Flomaton," in South Alabama, its lines diverge, the westward division deflecting through Mobile towards New Orleans. A much shorter line, trending to the southeastward, reaches the port of Pensacola. At this point also begins what is known as the "Pensacola & Atlantic Division." This division reaches the city of Jacksonville through connection with the lines of the Florida Central & Peninsular Railroad Company at a place on the Chattahoochee called "River Junction." Also, at River Junction the Pensacola & Atlantic connects with the Savannah, Florida & Western Railroad, which operates a line from that point via Bainbridge and Waycross to the port of Savannah. Contributory to the commerce of many states, with terminals at the ports of New Orleans, Mobile, Pensacola, and Savannah, all with abundant facilities for deep-sea navigation, the commercial communities of these cities and the public generally are gravely concerned for the legality and fairness of the freight rates these great railroads assess and exact.

To facilitate a clear understanding of the country and terminal points affected by this controversy, reference may be made to the subjoined diagram:

Before the interstate commerce commission it was complained that the freight rates charged upon shipments from stations on the Pensacola & Atlantic Division to Savannah were unjust and unreasonable in themselves; further, that such rates were relatively unjust and unreasonable when compared with the rates charged from the same stations to Pensacola, Mobile, and New Orleans. Consequently it was alleged that the complainants and all shippers of like situation

were subjected to unjust discrimination, and were made to suffer undue and unreasonable prejudice and disadvantage; that this redounded to undue and unreasonable preference and advantage to the mercantile communities of Pensacola, Mobile, and New Orleans, and to the Louisville & Nashville Railroad Company. The respondents appeared before the commission and made answer to the complaint. Evidence was taken, and the respondents were heard. Upon consideration it was found that the respondents were violating sections 1 and 3 of the act to regulate commerce. To arrest these violations the commission ordered: First. That the respondents should desist from charging a rate to Savannah of $3.30 per bale of 500 pounds of uncompressed cotton from any station on the Pensacola & Atlantic Division aforesaid, for the reason that this rate was deemed unlawful under sections 1 and 3 of the act. Respondents were further enjoined to desist from charging any other than reasonable, just, and lawful compensation for such transportation. Second. The commission ordered that the respondents should desist from charging the rate increased from $2.75 to $3.30 per bale on such shipments from the stations mentioned to Savannah, the commission declaring the whole of such increase to be unlawful. Third. The commission ordered the respondents to desist from charging from the stations mentioned a rate to Savannah which should exceed by more than 25 cents per bale of 500 pounds the rate charged at the time over the Louisville & Nashville Railroad from the same point of shipment to New Orleans. Relative to naval stores the commission ordered that respondents should desist from charging on shipments of carload lots of these products from the stations above mentioned to Savannah a rate of 24¼ cents per 100 pounds of rosin and 38½ cents per 100 pounds of turpentine. These rates were declared by the commission to be unlawful, under sections 1 and 3 of the act to regulate commerce. Respondents were also ordered to desist from charging or receiving any other than reasonable, just, and lawful rates for such transportation. Second. The commission ordered that the Louisville & Nashville Railroad Company desist from charging on car-load shipments of rosin from the stations mentioned via River Junction to Savannah any higher rate per 100 pounds for its service to River Junction than it at the same time charged or received for the transportation of car loads of rosin to Pensacola, for approximately the same distances. The commission also ordered that the Louisville & Nashville should desist from charging for its service to River Junction any higher rates per 100 pounds on shipments in car loads of turpentine from Mossy Head and other westerly stations on the Pensacola & Atlantic Division via River Junction to Savannah than it contemporaneously charged and received for the transportation to Pensacola of turpentine, in car loads, for approximately the same distances. The commission further ordered that the Louisville & Nashville Railroad should desist from charging on shipments of turpentine, in car loads, from stations east of Mossy Head on the Pensacola & Atlantic Division via River Junction to Savannah any higher rate per 100 pounds for its service to River Junction than 6 cents per 100 pounds in excess of the rate it had contemporaneously in force for

the transportation of turpentine, in car loads, to Pensacola from Sneads, the station nearest to River Junction.

From the report of the commission the following material facts appear: It is 259 miles by the line of the Savannah, Florida & Western Railway from River Junction to Savannah. Between the same points, by the line of the Florida Central & Peninsular Railroad, the distance is 347 miles. From River Junction to Mobile is 265 miles, and to New Orleans 406 miles. The Pensacola & Atlantic Railroad was constructed by the joint efforts of the state of Florida, the Louisville & Nashville, and the people who live along its line. To aid in its construction, the state conveyed to it nearly 4,000,000 acres of land. Of this grant over $1,000,000 worth of land has been sold by the Pensacola & Atlantic and the Louisville & Nashville. Considered as an independent line, the Pensacola & Atlantic is not prosperous, but the Louisville & Nashville, operating it since the beginning of the year 1885, is both solvent and strong. In 1889 the latter paid its accrued funded debt obligations and declared a dividend of 3½ per cent. on its stock. It has nearly $55,000,000 of stock outstanding. The country served by the Pensacola & Atlantic is sparsely settled. There are not 1,000 inhabitants at any town on the line except at Pensacola. It follows that the traffic originating along this division is not large. It consists mainly of cotton, naval stores, and lumber, some wool, and a few melons. Pensacola is a considerable city, and according to the census of 1890 had a population of 11,750. By the same census Savannah shows a population of 43,189. Pensacola is an important export market for lumber. Savannah is the largest market for naval stores in the world. The trade of Pensacola in naval stores is inconsiderable. Since the rates complained of went into operation, a very small amount of the rosin and turpentine produced along the Pensacola & Atlantic is shipped to Savannah. To show the difference in the markets, the commission points to the fact that in 1896–97 Savannah received 1,505,517 barrels of naval stores, while Pensacola received about 45,000 barrels. The term "naval stores" includes rosin, turpentine, products of crude turpentine, tar, and rosin oil; but rosin and turpentine are the only products involved in this controversy. There is but one grade of turpentine. It is shipped in standard barrels, weighing, when full, about 420 pounds. There are 15 grades of rosin known to the trade. These are designated alphabetically, and also as "window glass" and "water white." Rosin is also shipped in barrels, and is sold on the basis of what is known to the trade as a weight barrel of 280 pounds. The casks actually weigh 450 to 500 pounds each. The value of a barrel of rosin depends upon its grade, the highest price being "water white." The prices of the Savannah naval stores market control the price of naval stores in all the markets of the United States. At Pensacola the price of turpentine is always a half cent less per gallon, and the price of rosin 10 cents less per barrel of 280 pounds, than the daily closing quotations of the Savannah market. Eighty per cent. of the naval stores shipped to Savannah is exported, and only 20 per cent. is exported from Pensacola. It follows that lower export freight rates are obtainable at

Savannah than in Pensacola, and lower rates of marine insurance. At Pensacola there is only one firm dealing in naval stores. It is controlled by S. P. Shotter, a dealer in naval stores at Savannah. It is enabled to absolutely control the market at that place. It takes all the turpentine and rosin shipped to Pensacola at a smaller rate than the Savannah market without any regard to the activity of the demand at Savannah. At Pensacola there is no provision for inspecting naval stores. Savannah, on the contrary, has provided gaugers, who are sworn to the performance of their duty, and who act under bond. It is their duty to ascertain the number of gallons in each barrel of turpentine, and to detect any adulteration. Each barrel is also examined, weighed, and given its proper grade. There is also a supervising inspector appointed by the board of trade upon the recommendation of two-thirds of the buyers and factors of the naval stores market. At Pensacola the sole firm engaged in the business has one of its employés to gauge turpentine and grade rosin. All of the receipts are sold to this firm, who ship very largely to points in the interior. It further appears that the dealers in naval stores on the Pensacola & Atlantic Division of the Louisville & Nashville are dissatisfied with the results of gauging and grading at Pensacola, and they prefer to sell their product in Savannah. Instances to show the existence of good reason for this dissatisfaction are given in the testimony. It appears indeed that on the better grades a slight error of inspection may change the value from 10 to 30 cents a barrel. The commission finds that the grading and inspection at Savannah is more likely to be accurate. The Louisville & Nashville does not own or control any line of railroad entering the city of Savannah. Its revenues on east-bound shipments are for the short haul to River Junction. The conditions are reversed as to traffic going westward. A great proportion of the naval stores shipped from Pensacola & Atlantic stations westward are consigned to interior points like Louisville, Nashville, Cincinnati, and Chicago; and it follows that the Louisville & Nashville secures a long haul from Pensacola. It therefore is strongly interested to have this freight moved west, to or through Pensacola, rather than east by River Junction to Savannah, and its rates are made to induce a westward movement. A former agent of the railroad at a station on the Pensacola & Atlantic testified that his salary was made to depend to some extent upon whether shipments were sent west or east, and he received a larger commission when the traffic was destined west. It also appeared that shippers had difficulty in ascertaining the rates on shipments to Savannah, and solid car loads of rosin and turpentine were required when the shipments were destined to that point, while mixed car loads were accepted on the west-bound movement. These practices, the commission holds, discriminated against shippers desiring to use the Savannah market.

The commission also finds that through rates from all points on the Pensacola & Atlantic Division to Savannah are blanket or group rates, and are made in connection with the Savannah, Florida & Western and the Florida Central & Peninsular. The same rate is charged from all shipping stations on the Pensacola & Atlantic

without any regard to the distance of the stations from Savannah. When the complaint was filed, the rates were 15 cents a hundred pounds on rosin and 25 cents on turpentine. These were subsequently withdrawn, but of the rates as modified the Louisville & Nashville's share of the through blanket rate to Savannah equals its former local rates. It does not seem to be in dispute that this reduction of rates to Pensacola and increase of rates to Savannah is due to the direct interference of S. P. Shotter aforesaid. This is practically admitted in the argument of respondents' counsel and in the testimony of Mr. Shotter himself. The evidence, we think, supports these findings. River Junction, the eastern terminus of the Pensacola & Atlantic, is 259 miles from Savannah, and Pensacola, the western terminus, is 420 miles from Savannah. The distance from River Junction to Pensacola is seen to be 161 miles. It also appears that since 1892 a blanket through rate has been in force on all shipments of naval stores from stations on this road to Savannah. This rate is 24¼ cents per 100 pounds on rosin, and 38½ cents per 100 pounds on turpentine. Thus it appears that the same rate is enforced from all stations on the road, whether the traffic originates at Sneads, the station nearest to Savannah, or at Bohemia, a station 149 miles farther westward. In this connection the report of the commission affords a table, which clearly shows the prejudicial character of these rates against Savannah and in favor of Pensacola. A few instances will suffice to make this clear. On a shipment of rosin from Sneads to Savannah the Louisville & Nashville would receive 75 cents per barrel for a haul of 6 miles, while the Savannah, Florida & Western would receive only 46¼ cents for hauling the same barrel 259 miles. In other words, the Louisville & Nashville would receive nearly double the price for a 6-mile haul that the Savannah, Florida & Western or the Florida Central & Peninsular would receive for a haul of, respectively, 259 miles or 347 miles, if the shipment is via Jacksonville. On a shipment to Pensacola, however, from the same station, there is a vast difference. Sneads is only 6 miles from River Junction, but it is 155 miles to Pensacola, and the total charge made by the Louisville & Nashville for the long haul is only 47½ cents per barrel. Thus it is seen that the Savannah shipment, for a transportation of 6 miles, is mulcted nearly twice as much as the Pensacola shipment for a distance of 155 miles. The discrimination is made more surprising when we consider that Bohemia is 6 miles from Pensacola, and Sneads is 6 miles from River Junction. On a west-bound shipment from Bohemia to Pensacola the rate is 25 cents per barrel, on an east-bound shipment from Sneads to River Junction the rate is 75 cents per barrel. From De Funiak Springs, which is about half way between Pensacola and River Junction, the Louisville & Nashville will transport rosin to Pensacola for 7½ cents per 100 pounds, but charges 15 cents per 100 pounds for a haul the same distance to River Junction. From Cottondale, for a 35-mile haul of a shipment on the way to Savannah, the Louisville & Nashville charges more than the Plant System exacts for a 293-mile haul to Savannah from the same place. In thorough demonstration of the excessive and prejudicial character

of these rates afforded by the investigations of the commission, the court is furnished with a table of local rates over the Plant System covering 290 local stations. The distance of these stations to Savannah vary from 265 to 452 miles. The average distance is 358½ miles. The rates fixed vary from 10 to 18 cents on rosin and from 15 to 27 cents on turpentine. The distances from Pensacola & Atlantic stations to Savannah vary from 265 to 414 miles, the average being 339½ miles, and the blanket through rates from all these stations are 24½ cents on rosin and 38½ cents on turpentine. In the one instance we have local rates which are generally higher than through rates. In the latter we have through rates which are universally more liberal. In the former we have the greater average distance, in the latter the less. Yet the maximum charge of the Plant System to Savannah is 18 cents and the Louisville & Nashville 38½ cents per hundred pounds. The unreasonable character of these rates may be illustrated by another fact which appears in the evidence. It is 813 miles from River Junction to Louisville, Ky. It is only 259 miles to Savannah. And yet the highest rate from any Pensacola & Atlantic station to Louisville is 23½ cents on rosin and 30 cents on turpentine, while the Savannah blanket rate, as we have seen, is 24¼ on rosin and 38½ on turpentine. Thus it appears that, while the distance from the farthest point on the Pensacola & Atlantic to Louisville is double the distance from the farthest point on the same road to Savannah, yet the Savannah rates, in proportion to distance, are more than double the rates to Louisville. It is obvious from these facts, and from the other means and expedients resorted to to compel a westward rather than an eastward shipment of freight originating along its line, that the Louisville & Nashville has established a prohibitory tariff against shippers to Savannah. Whatever may be the wish of the shipper or the interest of the community at large, these rates compel the transportation of all the products of 161 miles of road to Pensacola, and, since there is but one dealer in naval stores at the latter point, this misuse of its franchises by this powerful railroad enables that person to enjoy an absolute and injurious monopoly of naval stores in that portion of the county tributary to 161 miles of this road,—a road constructed, as we have seen, for the general welfare, largely by individual sacrifice and the aid of the state.

The rates on uncompressed cotton, also the subject of animadversion and order by the commission, are not less prejudicial to the shipper than to the port of Savannah. Pensacola is not in any sense a cotton market. Savannah ranks among the first cotton ports in the world. These are Galveston, New Orleans, and Savannah. The rates imposed by the Louisville & Nashville on shipments from stations on the Pensacola & Atlantic Division to New Orleans and Savannah are blanket rates, or group rates, to both markets. At the date of the complaint the rate from Pensacola & Atlantic stations to New Orleans was $2.50 a bale, and to Savannah $2.75 a bale. In September, 1897, while the complaint was pending, the Savannah rate was raised from $2.75 a bale to $3.30 a bale, and no advance was made on the New Orleans rate. Consequently, the Savannah rate is 80 cents a bale higher than the New Orleans rate. At the time of the advance the rate of $2.75

per bale to Savannah had been in force for nine years, and appears to have been, as found by the commission, a reasonable, fair, and remunerative rate. There was no change of conditions. The sole reason assigned by the traffic manager of the Louisville & Nashville for the increase of rate was that the lines from River Junction to Savannah desired to secure more revenue for the transportation of cotton. Out of a rate of $2.75 the lines east of River Junction received $1, and the Louisville & Nashville received for the haul to River Junction $1.75 a bale. It does not appear, therefore, that the desire for the increase of revenue was confined to the connections of the Louisville & Nashville. This is plain from the fact that, while the average haul of the Louisville & Nashville to River Junction is 80½ miles, that company demanded and received $1.75 therefor, while the connecting roads to Savannah received only $1 for a haul of 259 miles. It may be true that the increase in rate was not made at the instance of the Louisville & Nashville, but it is evident enough that the excessive proportionate charge of that company is responsible for the increase, and consequently for the excessive through rate of $3.30 per bale. The commission condemns this entire through rate for its excessive character. That it is relatively prejudicial to Savannah, and preferential in favor of New Orleans, is also true. The average distance from stations on the Pensacola & Atlantic Division to Savannah is 339½ miles, while the average distance from the same stations to New Orleans is 326 miles. This makes the average distance to Savannah only 13½ miles greater, and yet the Savannah rate exceeds the New Orleans rate by 80 cents a bale.

Again, the commission furnishes a tabulated statement which affords much light for the proper determination of this controversy. This shows the rates on uncompressed cotton between numerous points, not on the Pensacola & Atlantic, and Savannah and New Orleans, respectively. The distances vary from 425 miles, from La Grange to New Orleans, to 1,173 miles, from River Junction to New York. The rates in the tables vary from 45 to 65 cents per 100 pounds, and yet the rate from all stations on the Pensacola & Atlantic to Savannah is 66 cents. It is true that some of these rates are from competitive points, but many are from strictly local stations like those on the Pensacola & Atlantic. It also appears from this table of rates on the principal railway lines in the cotton region are materially less than the rates charged from Pensacola & Atlantic stations to Savannah. From 22 local stations in Alabama on the Louisville & Nashville the distances to New Orleans range from 265 miles to 411 miles, the rates range from 50 to 60 cents. From 19 stations on the Seaboard Air Line, in North Carolina, South Carolina, and Georgia, the distances to Norfolk range from 336 to 573 miles, and the rates range from 41 to 49 cents. From 13 local stations on the Seaboard Air Line in Georgia the distances to Wilmington, N. C., range from 267 up to 413 miles, and the rates range from 38½ to 48 cents. From 19 local stations on the Southern Railway in South Carolina, Georgia, Alabama, and Mississippi the distances to Norfolk range from 434 miles to 1,054 miles, and the rates range from 38 to 61 cents. This comparative statement might be extended. In every instance the average distance on the roads last men-

tioned to the point of destination is much greater than the average distance from Pensacola & Atlantic stations to Savannah, and yet the rate is invariably much less. We find that it costs more to ship cotton from River Junction to Savannah, 259 miles, than it does to ship cotton from Sneads, a station on the Pensacola & Atlantic, 6 miles from River Junction, to New York, a distance of 1,173 miles, or from the most distant point in Mississsippi to Norfolk, 1,154 miles.

The facts ascertained by the commission and herein set forth are of the highest significance. In the absence of satisfactory reply by the respondents, they must control the action of the court. The act to regulate commerce (sections 14 and 16) provides that "the findings of fact in the report of the commission shall be prima facie evidence of the matters therein stated." And it will be observed that the conclusions of the commission upon the facts and the orders based thereon have equal effect. The interstate commerce commission must be regarded as an expert tribunal with relation to transportation rates. Said Judge Taft, delivering the opinion of the circuit court of appeals for the Sixth circuit in the case of East Tennessee, V. & G. R. Co. v. Interstate Commerce Commission:

"It has been suggested that the traffic managers are much better able, by reason of their knowledge and experience, to fix rates, and to decide what discriminations are justified by the circumstances, than the courts. This cannot be conceded so far as it relates to the interstate commerce commission, which, by reason of the experience of its members in this kind of controversy, and their great opportunity for full information, is, in a sense, an expert tribunal." 39 C. C. A. 425, 99 Fed. 64.

It may be added that whether the members of the commission be in fact expert or otherwise is not open to question, for they are, by section 12 of the act, required to execute and enforce its provisions regulating commerce. In the case of Interstate Commerce Commission v. Louisville & N. R. Co., 102 Fed. 709, the circuit court of the United States for the Southern district of Alabama declares:

"The findings of fact in the report of the commission are made by law prima facie evidence of the matters therein stated, and the conclusions of the commission, based upon such findings, are presumed to be well founded and correct."

It follows that the burden is upon the respondents to show the erroneous character of the commission's findings. A brief inquiry will indicate, we think, that this has not been done.

As a part of the defense it is contended by the learned counsel for the respondents that the rates complained of are justified because Pensacola is entitled to rates lower than to Savannah from stations on the Pensacola & Atlantic. This, however, does not meet the commission's finding. If Pensacola offered all the advantages to shippers that can be obtained in Savannah, the traffic would naturally go to the former market, for the reason that it is nearer. But since, on the other hand, superior advantages in the way of higher prices, better inspection regulations, cheaper export rates, and cheaper marine insurance are afforded at Savannah, that city may, in spite of its greater distance, expect to receive a share of the traffic originating on the Pensacola & Atlantic road, provided, of course, that the rates to Savannah are reasonable as compared with the rates to Pensacola. It does not

follow that, because the rates to Pensacola would ordinarily be less in the aggregate than the rates to Savannah, that the Louisville & Nashville has the right to make the latter so much higher and the Pensacola rates so much lower as to utterly exclude Savannah from any share of the traffic originating in its line.

It is further contended against the report of the commission that the fact that the Pensacola rates are lower does not establish the unreasonableness of the rates to Savannah. That may be conceded. It has been held that:

"The fact that a rate over a road or line in one direction is materially higher than the rate on the same road or line, and between the same points, in the opposite direction, does not, as in the case of a haul over the same line in the same direction, establish prima facie the unreasonableness of the higher rate." Duncan v. Railroad Co., 6 Interst. Com. R. 103.

Where the movement in a certain direction is greatly in excess of the movement in another, or where there is a substantial difference in the cost of operation by reason of heavy grades, or because the tonnage runs largely in one direction, it is conceivable that a discrimination in rates may not be unreasonable; but do any of these conditions appear in this case? On the contrary, by the evidence of a principal witness for the respondents the contrary is made to appear. Mr. Saltmarsh, division superintendent of the Pensacola & Atlantic Railway was asked: "Is there any reason why the haul east over the Pensacola & Atlantic Division should be more expensive than the haul over the division for the same distance west?" He replied: "So far as the actual cost of transportation is concerned, perhaps not; but the bulk of our business is southbound, and we have empty cars coming north. To the extent that this is the case, it would, of course, make a difference in the cost of transportation in each direction." Surely it cannot with good reason be urged that this would justify the tremendous difference in rates of which complaint is here made. Nor is there any other evidence to justify rates so preferential to one port and so prejudicial to the other.

It is, moreover, contended that it is competent for the Louisville & Nashville Railroad Company to advance its own interest to the extent of building up a seaport on its own line at the expense of another port on a rival line. That this may be done to a reasonable degree may be conceded. It is competent for a railroad company to so adjust its rates as to promote its legitimate interest, but it cannot, with this purpose, adopt rates excessive in themselves, unduly preferential to its own port and unduly prejudicial to another port. The rate to Savannah is not only excessive, but it is prohibitory. This is shown by the testimony taken by the commission. One witness— Mr. W. C. Powell, a commission merchant dealing in naval stores at Savannah—testified rosin and turpentine cannot be brought from Pensacola & Atlantic stations to Savannah because of the rates charged; that the superior market, the regularity and fairness of grading, superior marine insurance, and the like, afforded by Savannah, did not amount to enough to overcome the difference in rates. Another witness—Mr. J. H. Godwin—testified the rate seemed to be prohibitory in an easterly direction. The result is, not only to give the

inferior market of Pensacola a monopoly, but, as we have seen, to give the entire control of that market to one dealer in naval stores.

It is settled law relative to questions of this kind that discriminations or preferences in rates may be justified to safeguard the interest of the public. It follows that the contrary proposition is true,—that they may not be justified when they injure the interest of the public. The rates now in force result in injury not only to Savannah, but to the people along the Pensacola & Atlantic Railroad, for it debars them from the advantage of two markets for their products, and restricts them to one, and that the inferior market, and to a private monopoly there. Nor does the fact that the Pensacola & Atlantic, considered as a separate railroad, fails to pay its expenses, justify this discrimination in rates. There are many such roads absorbed by the principal railway systems of the country, and, if this contention were allowable, it would, in a great majority of cases, involving unfair and prejudicial rates, effectually nullify the interstate commerce law and the powers of the interstate commerce commission. Indeed, it has been held by the supreme court of the United States in Smyth v. Ames, 169 U. S. 544, 18 Sup. Ct. 433, 42 L. Ed. 819:

"It cannot be admitted that a railroad corporation maintaining a highway under the authority of the state may fix its rates with a view solely to its own interest, and ignore the rights of the public."

In the case of Road Co. v. Sandford, 164 U. S. 596, 597, 17 Sup. Ct. 205, 41 L. Ed. 560, the same high authority has declared:

"The public cannot properly be subjected to unreasonable rates in order simply that the stockholders may earn dividends. * * * If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it, and one which the constitution does not require to be remedied by imposing unjust burdens upon the public."

Many other considerations of less important character are suggested in the very able and extended oral and printed argument of the respondents' counsel. None of them, however, are deemed of sufficient weight to overcome that presumptive force which the law imparts to the findings of the commission. The considerations sustaining the report of the commission with regard to Savannah rates on naval stores are with the greater force applicable to its ruling with regard to rates to Savannah on uncompressed cotton. It is contended by the counsel for the defendants that the commission had no jurisdiction to declare this $3.30 rate unreasonable and excessive, because it was not in effect at the time of the hearing before the commission. It is true, however, that the respondents advanced the rate while the case was pending before the commission. The advanced rate was filed with the commission, and therefore its attention was called to it by the defendants. A matter in issue before the commission was the cotton rate to Savannah, and the legal effect of the commission's findings will not be defeated upon a technical objection of this character. Besides, whatever the defendants might have said before the commission, they are estopped from objecting to the jurisdiction of this court, because in their answer to the tenth paragraph of the bill they deny that the rates charged and received by them at the date (January 8, 1900) of said order—Exhibit F to the bill—were then or are now in violation of

sections 1 and 3 of the act to regulate commerce, as found by the commission in its report and opinion,—Exhibit E hereto attached. On this issue evidence has been taken, and the defendants have clearly submitted to the jurisdiction of this court in respect to the advanced cotton rate.

It may be said generally that in this case the usual plea of competition is neither set up nor available to sustain these rates. The discriminations against Savannah are practically admitted by the respondents. The sole justification relied upon is the promotion of the interest of the Louisville & Nashville Railroad by building up a nearby port, and further by securing the long haul from Pensacola towards the northwest. But considerations of this character cannot justify rates unreasonable and excessive, in violation of section 1 of the law. Nor can they justify rates unduly prejudicial to one locality and unduly preferential to another, in violation of section 3 of the law. Nor has a railway company engaged in interstate and foreign commerce the right or authority to enact rates which are actually prohibitory to traffic in one direction without regard to the wishes of the shippers, or the fair opportunity of a community thus prejudiced to promote its commercial prosperity. In all cases it must be regarded as true that discriminations made for the purpose of promoting the interests of the carrier are subservient to the interests of the general public and to the principles of justice in such matters sought to be attained by the purpose of congress to regulate commerce. It is self-evident that rates which would give to producers and manufacturers on the Pensacola & Atlantic the competitive benefit of the Savannah market would be more conducive to their business and prosperity than rates which confine them to the Pensacola market; and, while it is true that a carrier has the right to exact a fair return for the public utilities it affords, the public is entitled to exact that no more be required of it for the use of such utilities than the services rendered are reasonably worth, and where there is a plain and irreconcilable conflict between the interest of the public and the interest of the carrier the former must prevail.

In this case an injunction will be granted against each and all of the respondent companies, so that the order of the commission may be enforced. This is made necessary by the fact that the rates to Savannah, which are declared to be unreasonable and prejudicial, are joint through rates of all the defendants. Such rates must be construed as entireties. It follows, necessarily, that each carrier who is a member of the through line must be regarded as severally as well as jointly responsible for the unfair and oppressive rate. While this unfairness appears to be attributable to the exactions made by the Louisville & Nashville, the other members, by their assent, are joint participants in the wrong. These are regularly published rates, in which each of the defendants participated, and their proportionate divisions are brought about by agreement between themselves. This constitutes "a common control, management, or arrangement for a continuous carriage or shipment," as defined by section 1 of the act to regulate commerce, and it therefore appears that each of the participating roads are within the scope of the act to regulate commerce, and to the extent of its authority under the control of the interstate commerce commission.

118 F.—40

Louisville & N. R. Co. v. Behlmer, 175 U. S. 662, 20 Sup. Ct. 209, 44 L. Ed. 309; Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 192, 193, 16 Sup. Ct. 700, 40 L. Ed. 935; Texas & P. R. Co. v. Same, 162 U. S. 205, 16 Sup. Ct. 666, 40 L. Ed. 940.

We do not underestimate the gravity and importance of the interests involved in this controversy. The record has been given that anxious and deliberate consideration, seemingly appropriate, and which, besides, was made necessary by its great volume and complexity. The railways of our country have been aptly said to constitute the arteries of the national life. The public official or other person who would grudge to them the large measure of prosperity which their inestimable services to the country deserve is as shortsighted as unpatriotic, as narrow as unjust. While this is true, the mistakes or excesses of zeal or judgment on the part of railway officials may at times make these vast enterprises, ordinarily benevolent, instrumentalities of grave private wrong and communal injury. The framers of the constitution, though unconscious of the indescribable development in the intercommunication of the people, yet "prophetic and prescient of all the future had in store," provided for every contingency when it bestowed upon congress the tersely expressed but elastic power "to regulate commerce with foreign nations and among the several states." Congress has exercised this power, and the righteous orders of the great commission it has primarily entrusted with the tremendous duty should in all proper cases be respected and enforced by the courts of the country. The organic law upon which this power in congress and in the courts is founded is the sure guaranty to investors in transportation lines against the assaults whether of the agrarian or the demagogue, the anarchist or the mob. While, on occasion, the railway company or other corporation may suffer a temporary diminution of revenues from an order of this character, the interest of the public, and in the end the interest of the corporation itself, is conserved. In all such cases the general welfare must control. "Salus populi est suprema lex."