PERKINS et al. v. NORTHERN PAC. RY. CO. et al. KENNEDY et al. v. GREAT NORTHERN RY. CO. et al. WOODWARD et al. v. CHICAGO, M. & ST. P. RY. CO. et al. LIVINGSTON et al. v. CHICAGO & N. W. RY. CO. et al. BREWSTER et al. v. CHICAGO, ST. P., M. & O. RY. CO. et al. SHILLABER v. MINNEAPOLIS & ST. L. RY. CO. et al. HUMBIRD v. CHICAGO GREAT WESTERN RY. CO. et al. BARROWS v. MINNEAPOLIS, ST. P. & S. S. M. RY. CO. et al. CARLE v. CHICAGO, R. I. & P. RY. CO. et al. JAMES v. GREAT NORTHERN RY. CO. et al.

(Circuit Court, D. Minnesota, Third Division. September 23, 1907.)

Nos. 857–865, 870.

1. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.

A suit to enjoin state officers or a state commission from enforcing a state statute or regulation fixing maximum railroad rates is not one against the state, of which a federal court is prohibited from entertaining jurisdiction by the eleventh constitutional amendment; no property or revenues of the state being affected by such suit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 844½.

Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

2. EQUITY—PLEADING—MULTIFARIOUSNESS OF BILL.

A bill which seeks to enjoin the Attorney General of a state from taking steps to enforce state statutes fixing railroad rates is not multifarious because it also joins the members of the State Railroad and Warehouse Commission as defendants, and asks an injunction restraining them from enforcing an order made by them under legislative authority also affecting rates.

3. CORPORATIONS—SUITS BY STOCKHOLDERS—CONDITIONS PRECEDENT.

Stockholders in corporations, who made demand either upon the directors or the managing officers of their corporations to refuse to comply with a state statute alleged to be unconstitutional, and whose demands were in each case refused on the ground of the severe penalties imposed by the statute upon such officers and directors for their failure to obey its requirements, *held* to have sufficiently complied with equity rule 94 to entitle them to maintain a suit in a federal court to enjoin the corporation from complying with such statute.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 793.]

4. CARRIERS—STATE REGULATION OF RATES—DETERMINATION OF VALIDITY.

Where a state enacted successive regulations of rates to be charged by railroads on intrastate business, each of which necessarily affected the earnings of the railroad companies, the validity of such regulations as to whether they are unconstitutional as confiscatory is to be considered separately; the first without reference to the subsequent ones, and the latter with reference to the effect of those previously enacted.

5. COURTS—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A suit to enjoin the enforcement of state enactments regulating railroad rates, on the ground that the same are confiscatory and would deprive the railroad companies of their property without due process of law and deny them the equal protection of the laws, in violation of the fourteenth constitutional amendment, is one arising under the Constitution of the United States, of which a federal court has jurisdiction on that ground.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 820, 822.

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; City of Helena v. Mills, 5 C. C. A. 11.]

**6.** INJUNCTION—PRELIMINARY INJUNCTION—GROUNDS FOR DENIAL.

Where rates of charge by railroad companies for the intrastate carriage of commodities and passengers have been fixed by the state, and such rates have been accepted and put into operation by the railroad companies, a preliminary injunction will not be granted at suit of stockholders of such companies to restrain further enforcement of such rates by the state or obedience thereto by the companies; the legitimate purpose of such an injunction, except in cases of fraud, being to preserve the status quo pending a final hearing on the merits.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 302–306.]

**7.** CARRIERS—STATE REGULATION OF RAILROAD RATES—CONSTITUTIONALITY OF STATUTE.

A preliminary injunction granted restraining the putting into effect of Act Minn. April 18, 1907 (Laws 1907, p. 313, c. 232), fixing rates for the carrying of commodities by railroads within the state on the ground that such rates, if enforced, in connection with reductions in both commodity and passenger rates made by prior acts, would on the showing made be confiscatory, and would deprive the companies of fair compensation for the services performed and a fair return on the property invested.

In Equity. On motions for preliminary injunctions and demurrers to bills.

How, Butler & Mitchell, Robert Thorne, and Robert A. & Henry W. D. Forest, for C. E. Perkins, J. S. Kennedy, J. T. Woodward, C. Livingston, G. S. Brewster, W. Shillaber, J. J. Carle, and H. A. James.

Stiles W. Burr, for J. A. Humbird.

Lancaster & McGee, for F. C. Barrows.

C. W. Bunn, for Northern Pac. Ry. Co.

E. T. Young, Thomas D. O'Brien, Royal A. Stone, C. S. Jelley, and George T. Thompson, for Atty. Gen. E. T. Young and Railroad and Warehouse Commission.

William C. Bicknell, for J. R. Reeve.

T. F. White and George H. Tyler, for O. J. Whiteman.

Wm. R. Begg, for Great Northern Ry. Co.

E. P. Peterson, for John Palm and L. Larson.

F. W. Root, for Chicago & St. P. Ry. Co.

Samuel A. Lynde, for Chicago & N. W. Ry. Co.

Thomas Wilson, for Chicago, St. P., M. & O. Ry. Co.

George W. Seevers, for Minneapolis & St. L. Ry. Co.

A. G. Briggs and J. L. Erdall, for Chicago G. W. Ry. Co. and others.

Alfred E. Boyeson, for Northwestern Fuel Co.

C. Louis Weeks, for C. H. Tripp and E. B. Swygart.

Alfred H. Bright, for Minneapolis, St. P. & S. S. M. Ry. Co.

R. J. Stromme, for E. Sauby.

Stringer & Seymour and R. A. Jackson, for Chicago, R. I. & P. Ry. Co.

LOCHREN, District Judge (orally). Gentlemen, I feel that it is a subject of congratulation that through this long-continued contest there has been such uniform courtesy displayed by counsel on both sides, not only towards the court, but towards each other. The cases have been fully and ably presented to the court, upon both sides. If circumstances permitted, I should be glad to give the cases further consideration

than I feel myself able to. In view of the necessity of attending to other business, and especially in view of the fact that the October term in Minneapolis is coming on, I think it better that I dispose of the cases according to my first impressions than to detain them for further examination, which would hinder the ultimate settlement of the issues.

These suits have been brought by one or more stockholders of each of nine railroad companies doing business within the state of Minnesota, and each of them also engaged in interstate business, claiming that the rates fixed by the Railroad and Warehouse Commission, and which have been termed by counsel the "Merchandise Rates," as well as the rates fixed by the Legislature of the state by the act of April 4th of the present year (called the "Passenger Rate Law"), and the rates also fixed by the Legislature by the act of April 18th of the present year (chapter 232 of the statutes of this year [Laws 1907, p. 313]) are so low as to not afford adequate compensation to the railroad companies for the services that they are required to perform and a reasonable return upon the property which is invested by these railroad companies, and used in the business, and therefore are confiscatory under the provisions of the Constitution of the United States that no state shall deprive any person of life, liberty, or property without due process of law, or deny equality under the laws; that the requiring of the railroad companies to do business at these rates would not afford adequate compensation, and are equivalent to taking their property without due process of law. These bills of complaint are met by demurrers upon various grounds, one of which is that, being brought against the Attorney General and other state officers, but especially the Attorney General, they, in fact, amount to actions brought against the state, which are prohibited, so far as the federal courts are concerned, by the eleventh amendment to the Constitution of the United States. This matter I disposed of at a preliminary hearing, contrary to that contention, holding that, although the state is interested in this matter, these suits are not, in terms nor in necessary effect, actions against the state. No property of the state is affected, no revenues of the state are affected, by the result of the litigation, and although the eleventh amendment to the Constitution prohibits suits, or actions, against the state, by citizens of another state or of a foreign country, the fourteenth amendment provides that the state shall not deprive any person of life, liberty, or property without due process of law. There must be some way to enforce that provision of the Constitution. It is a provision which requires no action of Congress to make it effective. It is a prohibition against the state, and, if the state by any act attempts to deprive any one of life, liberty, or property, without due process of law, the courts must provide some adequate remedy for the protection of such person. It would be a reproach to the courts did they fail to provide an adequate remedy in a case of that sort. And it is unnecessary in these cases to hold that the eleventh amendment would be ineffective as against the later provision, in the fourteenth amendment, if the remedy can be reached in another way; and it seems to me that it can—by tying the hands of the officers of the state, if necessary, in a proper action, and restraining them from attempting to enforce or put in effect a provision of the law

of the state which is unconstitutional under the terms of the fourteenth amendment. This has been done in so many cases that it seems to me it does not now require argument to sustain that position, and I therefore hold that that ground of the demurrer is not well taken.

Another ground is that the bills are multifarious, in joining the Warehouse and Railroad Commission and the Attorney General, because the acts complained of are separate and distinct acts and the acts of different bodies. The order of the Railroad and Warehouse Commission, of September 6th of last year, was promulgated by that commission under the authority of a legislative act, and, as has been decided in many cases, such an order has the same effect as a legislative act; that is, that the Legislature has a right to empower administrative bodies to act in respect to this matter of rates and other matters of regulation concerning public corporations engaged in the business of transportation, so that its order has the same effect as a legislative act. And the other two acts complained of are acts passed by the Legislature. They all amount to legislation that has been put forth by the state, and it seems to me that complaints against all these acts may properly be joined in one action, and that the Railroad and Warehouse Commission have such charge in respect to the enforcement of these rates that they can properly be made defendants in an action of this kind, as well as the Attorney General.

Another objection is that the bills do not show compliance with the ninety-fourth equity rule; such compliance being necessary to permit actions of this sort to be brought by stockholders. Whereas, matters in which a corporation is concerned are properly under the management only of the officers and directors of the corporation, who should ordinarily be parties to an action to enforce corporate rights, and providing that such suit will not be allowed to be maintained by a stockholder unless it appears that he has first applied to the officers and directors of the corporation, demanding that they should enforce the rights which he complains are being infringed, and secure the safety of his property; the property being, of course, ultimately the property of the stockholders, and only upon their refusal to do so will he be allowed to bring an action to protect himself. It seems to me that that has been done sufficiently in these cases. In every one of them an application has been made, either to the directors or to the controlling officers of the corporation whose duty it would be, in a proper case, if it was necessary, to call a meeting of the directors to act upon the matter, and either where the directors have met together, or where the matter has been disposed of by the officers, the stockholders have been met with a direct refusal to take any action to protect the property against these alleged illegal attacks upon it. The reason alleged by the officers of the company and by the directors for not taking such action was, not that they doubted or denied the claim of the stockholders that this order and these acts were confiscatory, and null and void under the Constitution, but that by the provisions of the acts themselves such severe penalties were denounced for any attempted violation of the acts that they ought not to be called upon to incur the danger of those penalties, and would not assume that danger, and, for that reason, would not act in the mat-

ter. And it seems to me, in view of the severe penalties denounced by these acts of the Legislature, that the officers of the corporations could not have done otherwise than to have refused to act under those circumstances, where their action would have laid them liable to severe penalties; and every subordinate, who under their direction should attempt to violate these provisions, being also liable to like penalties, would also refuse. There is no question but that such legislation is vicious, almost a disgrace to the civilization of the age, and a reproach upon the intelligence and sense of justice of any Legislature which could enact provisions of that kind. In case of the refusal to issue a ticket at a certain rate which is fixed by the Legislature as proper, but which the railroad companies hold to be void and unconstitutional (and which would be an act of itself not immoral nor malum in se, but would ordinarily afford the person who was refused the privilege of a ticket a right of action against the railroad company), in case he was in the right and the refusal was wrong, there would be no question but that in a civil action any such person would receive an adequate remedy; there would be no danger that any court or jury would refuse to give ample damages. Beyond question, the result of actions of that kind would be that the damages would almost certainly border on the excessive, instead of failing to remunerate the party for any wrong he would suffer on account of such a refusal. But under the provisions of these laws, acts not immoral or wrong in themselves, but which are only unlawful because prohibited, would entail upon the person refusing to comply with such laws the position of being convicted of a felony. They make the refusal a felony, and impose a punishment very unusual —a fine that might be to the amount of $5,000, or imprisonment in the state prison to the extent of five years, or both, in the discretion of the court; punishments which are applied only to the very highest crimes short of homicide of which men are ever guilty; punishments which would be deemed adequate in cases of burglary, highway robbery, or crimes of the highest character, short, as I say, of homicide. There is no doubt that the directors and officers of railroad companies were entirely justified in refusing to take the hazard that would fall upon them (and their employés, if they acted under their advice) by taking any steps to save the stockholders from the consequences of these laws.

I agree with counsel for the defendants that these matters must be considered separately. For instance, the order of the Commissioners of September 6, 1906, which went into effect on November 15th of the same year, must be considered by itself upon the charge that it did not afford adequate compensation to the railroad companies and had the effect of confiscating their property. If it did not have that effect, it would not have that effect if the subsequent acts added to it had that effect. And so with the act of April 4th—the passenger act. If that did not reduce the revenues of the companies to a degree which would leave them without sufficient compensation, even after the reducing effect of the order of the commissioners, then that would not be unconstitutional; it would be constitutional and proper. And the same remarks would apply to the act of April 18th, which affected the rates chargeable upon commodities. It would have to be considered, of

course, with reference to the reductions theretofore made by the two previous acts; but if that still left enough to compensate the railway companies for their services rendered in the transportation, and left an adequate return upon the value of the property which was used in the transportation within the state, the complainants would have no cause for complaint. But, of course, the latter act must be considered with reference to the reductions made in the earlier order and the earlier act. Now, I will not attempt—it would be impossibe that I should do so—to go through with the different estimates that have been made in respect to the expenses of the railroads in the transportation of freight and passengers, state and interstate, and what is applicable to the state properly.

It is argued that this court has not jurisdiction of the case because it does not raise any federal question, for the reason that there is no controversy as to the effect of the constitutional provision in the fourteenth amendment, that I have referred to, because it is admitted on the part of the defense that the construction claimed for that provision by the complainants is the true construction, and that there is no controversy in relation to it, and that the only controversy arising upon this hearing is in relation to matters of fact alone. With respect to that, I might say that there is not really any controversy in respect to matters of fact, until we come to the ultimate facts in the case. There is no controversy as to what the order of the Railroad and Warehouse Commission actually was. There is no controversy as to the terms of that order or its effect upon the different articles of merchandise in respect to which it fixes the rates. There is no controversy in relation to the purport of the two different acts of the Legislature to which I have referred. There is no controversy with respect to the showing which has been made by the railroad companies as to the cost of transportation, their operating expenses in the past, and the anticipated increase in those expenses in the present year. Nor is there any controversy with respect to the amount invested in these railroad properties, in the first place. There has been no attempt to show that they are different from what they are claimed to be in the showing made by the railroad companies themselves, nor with respect to the fixed charges, which are incumbrances upon these different properties, nor with respect to the amount of stock outstanding in these different companies. In relation to some of them (the Chicago Great Western in particular), I believe that the evidence is that there are no outstanding bonds, anything which is usually reckoned by railroad companies as among their fixed charges; but it does appear that there are outstanding debentures, and that there are classes of preferred stock, several of them, each class in its order being allowed a certain amount of dividend before the next class in order would be entitled to any, and so on, until we come to the common stock. And I am inclined to think that debentures of that kind, and preferred stock, which is entitled to dividends before anything goes to the common stock, are very much of the same nature as bonds or securities, which would be entitled to the payment of interest upon them before there would be any dividends on the preferred or common stock.

That they are very much of the same character as these others which are reckoned under the head of fixed charges.

Now, the showings by the different railroad companies amount to this: That in the years past, including the year 1906, there was not enough revenue from the business carried on within the state, including business that was entirely local to the state and the share of the interstate business which would properly be chargeable to or applied upon the property of the railroad companies within the state, to entirely pay the fixed charges outstanding and afford any adequate dividend or compensation to the owners of the stock itself, which represents the property, after paying all the operating expenses; and the showing was, in some cases, that there were no charges made, in the keeping of the accounts, under the head of or for or on account of depreciation in the road or rolling stock, the property of the company. It is evident that there ought to be a proper account under that head; that a railroad, like everything else, will wear out in time, and they have been used so long in this country that there can be a reasonable estimate of the percentage of loss each year from depreciation of the roadbed, culverts, bridges, rolling stock; that it would be proper to lay aside a reasonable amount to furnish replacements, renewals, and repairs when needed; and that if that was not done the railroad company might soon be in a position in which it could not keep up, with the receipts that it was getting, and maintain its property in an efficient state to render such service as the public is entitled to receive from it. Now this is a matter in which the public has an interest, as well as the railroad companies and the stockholders of the railroad companies. Some of us older men can remember, in the early days, about the time when the state was admitted, the great anxiety that the people of the state had at that time that railroads should be brought into the state; that persons having capital should be induced to bring railroads into the state; that it was necessary for the prosperity and the upbuilding of the state that it should have railroad connections with the rest of the world; that great and successful efforts were made to get large subsidies, in the way of land grants, from Congress; and that almost every community in the state, every village that had hopes of getting a railroad to it, counties, and all the municipalities were ready to vote, and did vote, bonds as subsidies, for the purpose of inducing men with capital to come into the state and build railroads. They could foresee that it was necessary for the advancement and prosperity of the state to bring emigrants and others into the state, and change what at that time was a large waste into the sites of prosperous cities, thriving towns, and villages and farms, and therefore to have railroads built, giving them connection with the rest of the world; that there should be a way to take farm products, grain, cattle, hogs, everything that was produced by the farmer, in the quickest manner to the best market, and to bring into the state commodities that were needed by its people. And that was done. Railroads were built. We have them. We see the effect of the railroads; and I think every one will admit that no institutions that we have had in the state have done so much to bring about the present state of prosperity, upbuild cities, and cover the state with prosperous farms and with a large population, as the railroads; and it

would certainly be a very great calamity if these railroads were dealt with in such a way as to destroy their efficiency and usefulness to the inhabitants of the state. But, notwithstanding this, there is, of course, a danger that the mass of the people, looking upon these large aggregations of wealth, seeing occasionally a person who is reputed to be or who has become wealthy on account of his connection with these railroads, and that they are getting considerable amounts of money from the people of the state as compensation for the services that they are performing, will manifest a disposition to reduce this compensation; to save to the people a certain amount of what they have to pay when they patronize the railroads as passengers, or have commodities of any kind to ship upon the railroads. It is quite natural that they should want to have those charges reduced to the lowest point, at any rate, which would be consistent with keeping up the efficiency of the railroads and the advantages which they are receiving from them. There is a danger, that this feeling of selfishness may lead them too far, and reduce this compensation so much that it will not enable the railroads to serve them with efficiency—to keep up their roadbed, culverts, bridges, and everything so that they will be entirely safe for the transportation of passengers and freight, and to keep the rolling stock in the best state of efficiency, and enable them to provide the best service attainable. And that is exactly what those corporations are required to do. They are required to exercise the highest degree of care in relation to the transportation of passengers, and a high degree of care in relation to the transportation of freight, and it is certainly for the interests of the people that they should be enabled to do this; and it would be a very short-sighted policy which would reduce the compensation of these railroads to a degree that would disable them from performing these services fully and fairly for the benefit of the people.

A question has been raised in the case that these rates fixed by the Railroad and Warehouse Commission and by the Legislature trench upon the authority of Congress under the commerce clause of the Constitution, which gives to Congress the entire control and regulation of commerce among the states and with foreign nations and the Indian tribes. There is no question made that this is an exclusive power, and that no state has any right to trench upon it in the least, and the decisions of the Supreme Court have been quite frequently to the same effect. In the Eubank Case (Louisville & N. R. Co. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416), and in the case of the transportation from St. Louis to Texas (I do not remember the title), where the Legislature provided that the shipper could not recover any greater amount than was stated upon the bill of lading, and where, after the bill of lading had been issued, the Interstate Commerce Commission, or some persons acting through its authority, raised the rate, and the railroad company collected the rate, which was above the amount named in the bill of lading, the Supreme Court held that an act of that kind by the Legislature was matter affecting interstate commerce and not within the power of the Legislature to enact. There were several of those decisions referred to on this hearing.

It is claimed on the part of the complainants that these regulations of rates in this state, passenger and freight, do interfere with interstate

commerce, and instances have been cited as to their effect upon transportation between, we will say, the Twin Cities, and points on the border line of North Dakota; a comparison between the rates which the state has fixed, which would govern as between these cities and Moorhead, and rates which would govern transportation across the river to Fargo. And it has certainly been very persuasively argued that these rates, fixed by the Minnesota Legislature in relation to transportation in Minnesota alone, do of themselves necessarily interfere with interstate commerce, and, under the provisions of the Hepburn law, prohibiting discrimination in respect to localities similarly situated, it is claimed that if the railroad companies themselves, without authority of the state, should fix the present rates between these cities and Moorhead and the interstate rates now existing between these cities and Fargo (and the same with Grand Forks and other places) that they would be liable to prosecution for discrimination. And it would seem to be very difficult to avoid that conclusion, and the conclusion that these rates fixed in respect to Minnesota do necessarily and directly affect interstate commerce. But, on the other hand, we have decisions of the Supreme Court, going back at least as far as the case of Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, and the Granger Cases (Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94; Peik v. Chicago & N. Ry. Co., 94 U. S. 164, 24 L. Ed. 97; Chicago, M. & St. P. R. Co. v. Ackley, 94 U. S. 179, 24 L. Ed. 99; Winona & St. P. R. Co. v. Blake, 94 U. S. 180, 24 L. Ed. 99), and repeated by very many decisions since and up to the present time (the last one being what may perhaps be termed the dictum of Mr. Justice White in the case which was decided only on the 19th of April last), to the effect that the state has the right to fix rates in respect to local business within the state; that each state has that right. That has been, as I say, decided over and over again by the Supreme Court, and as it is a fact that, if these rates fixed by the Minnesota Legislature do interfere with interstate commerce, it is not simply the rates between here and Moorhead which interfere with it, but it would be as well the rates fixed to any point near the borders of the state, the rates in the state to Willmar, or Detroit, or Crookston, would, in the same way, to a lesser degree, interfere with the interstate rates that existed prior to that time between these cities and points in North Dakota. A holding that they did so interfere, and for that reason are unconstitutional, if held at all, would apply, it would seem to me, to these rates entirely throughout the state. The state is bordered on all sides by other states, and I do not think it can be held that the rates simply to Moorhead might be unconstitutional, and the rest of them constitutional; but, in view of the decisions of the Supreme Court, to which I have referred, and which have been so continually adhered to down to the present time, it seems to me it would be very improper that I should attempt, on this preliminary hearing in this case, to make a holding entirely contrary to those holdings of the Supreme Court. I should hesitate very much before doing so. Although I do not think I ordinarily hesitate in any case to rule as I deem to be correct according to law, I certainly do pause before holding that these rates are not within the power of the Legislature, if they are fairly compensatory.

I have no doubt that Congress might very properly, under the constitutional provision giving it the entire power of control over interstate commerce, assume control of the avenues of interstate commerce, of the railroads which are engaged in interstate commerce, and of all rates which are collected by those railroads, whether within the states or without the states, because the matter of those rates would affect these avenues of interstate commerce, and might affect their ability to continue as avenues of interstate commerce. The rates, if they were fixed by the states, might be fixed so low in one state, and another, and all of them, that the railroads could not exist and could not perform their functions as carriers of interstate commerce, and for the purpose of securing these railroads as carriers of interstate commerce, Congress would have the power, under that provision, to take the entire control of the regulation and the rates which the carriers of interstate commerce, upon the avenues of interstate commerce, would have the right to charge, the same as Congress has assumed the right, under the very same clause, to control the navigation of the coastwise waters, bays, and lakes, and the rivers running through the country, even if the rivers are entirely within a particular state. They have as much control of the Mississippi river above the Falls of St. Anthony as they have between St. Louis and New Orleans; the same control of the Minnesota river, which is entirely within the state—both of which streams have been used for the purpose of navigation within my recollection. On the upper Mississippi, above the falls, there were two lines of steamboats, before the war, for some years, and upon the Minnesota river there were several lines of steamboats, running as far up as Ft. Ridgeley, I think, and after Congress assumed the control of navigation entirely, it applied this control to those rivers just as much as to rivers that run between states and through several states, and applied it to the bays and inlets on the coasts of the ocean, where there was navigation running from one state to another. The same with the coasts upon the Great Lakes. I think there is no doubt but that matter would be within the control of Congress. But, as has been held by the Supreme Court in many cases, where Congress has the power to exercise control, as long as it fails to exercise it, the states may exercise control in all matters that are proper—police regulations at any rate. And until Congress does exercise that control, and certainly while the Supreme Court continues to hold, as it has, that the states may regulate the local commerce that is entirely within the state, I do not think it would be proper that I should attempt to hold that these acts are void as invasions of the right of Congress to control exclusively the avenues of interstate commerce, although I must confess that the arguments to the effect that these particular acts of the Minnesota Legislature do interfere, necessarily and directly, with interstate commerce, are extremely cogent.

Now, with respect to the order of the Railroad and Warehouse Commission which went into effect on the 15th of November last, and which was accepted by the railroad companies, and which they acted under from that time to the commencement of this action, and in respect to the passenger rates, which were fixed by the act of April 4th of the present

year, and were accepted by the railroad companies, it is claimed that no preliminary injunction should issue having the effect to stop the operation of that order and that act, and that the office of a preliminary injunction is simply to keep matters in statu quo until the final decision of the case. That is, ordinarily, the effect of a preliminary injunction, and ordinarily it ought not to be extended beyond that. It is true that there may be cases—for instance, where a trustee of property is attempting to put that property in the hands of a third person and to defraud the cestui que trust of the property or of its use or benefit, and where that is made clear, and where it has not gone fully into effect, but has partly gone into effect, and that is made clear, a preliminary injunction may be made so far mandatory as to require—where the property has been partly taken away from the hands of a trustee, perhaps by his own fraudulent consent, and the cestui que trust is likely to be deprived of it—that even a preliminary injunction may be made mandatory so far as to require that that property be restored to the hands of the trustee, or into such hands as the court may place it, to preserve it for the benefit of the cestui que trust. But that exercise of authority ought not to extend beyond cases where there is actual fraud; where the person receiving the property has no fair claim of right, no fair color of right to the property.. If he can show that he has a fair color of right which may be litigated, he ought not to be deprived of an opportunity to preserve the status quo until the matter should be properly determined. Now, in this case, in respect to the rates fixed by the Railroad and Warehouse Commission, it is claimed on behalf of the state (and claimed, no doubt, honestly) that these rates are not confiscatory, that they do afford an adequate compensation for the services rendered, in view of the property which is used in the business, and that they are entirely valid; and the same way with the passenger rates. The state insists (and, no doubt, entirely in good faith) that these rates are compensatory, that these acts are not confiscatory, and that they are not in violation of the constitutional provision in any manner. And it seems to me, under those circumstances, that the preliminary injunction cannot go against the enforcement of the rates fixed by the Commission, nor the passenger rates which have been accepted by the railroads and are in operation. I say this without any reference to the fact that the court would have no right to fix rates if it should be determined to enjoin either of these rates. And this will obviate the necessity, upon this hearing, of determining whether the rates fixed by the Commission, or the passenger rates, together or singly, are confiscatory, and do not afford reasonable compensation for the services rendered and a proper allowance with respect to the property employed. These, I think, need not be considered.

But the act of April 18th, fixing the commodity rates, has not yet gone into effect.· It has been restrained by the preliminary order of this court. And if it appears on this hearing that the rates fixed by that commodity act, in view of the lessening of the rates by the Railroad and Warehouse Commission and the lessening of the rates by the act of April 4th, are not sufficient to be compensatory, and are in fact confiscatory, the preliminary injunction ought to go against the putting

of those rates into effect. As has been said, the showing in the case is that, under the rates that were in effect prior to any of these mentioned going into effect, the amount of compensation received by the railroad companies for the services done within this state, in respect to transportation within the state, of property and persons, was not compensatory; that in the case of the stronger roads, although it came very nearly being compensatory, in relation to the others they were far from compensatory. And it was virtually admitted that the effect of the order made by the Railroad and Warehouse Commission was to reduce the amount of compensation which the railroad companies would receive upon the articles that were covered by that order, on merchandise within the state of Minnesota, some 20 per cent. to 25 per cent. (I think that appeared in the report made by the Railroad and Warehouse Commission to the Legislature), and that the effect of the act of April 4th, with respect to passenger rates, cutting the rate from three cents to two cents per mile, which, upon the face of it, would be a cut of 33⅓ per cent., was in fact, in view of all conditions, actually a cut of about 22 per cent. or 23 per cent. of the amount which was paid before for like services. It seems to me, upon this evidence of the conditions before either of those new rates were put into effect, and the reductions made by those rates, that, if there is added the reduction which is attempted to be made by the commodity act, it will reduce the compensation received by the companies below what would be a fair compensation for the services performed, including an adequate return upon the property invested. And I think, on the whole, that a preliminary injunction should issue, in respect to the rates fixed by chapter 232, talked of as the commodity rates, and that there should be no preliminary injunction as to the other rates, although the matter as to whether they are compensatory or not is a matter which may be determined in the final determination of the action.

An order will be entered overruling the demurrers in each case.